Wright vs. Jackson.

WRIGHT vs. JACKSON.

*February 1— February 19, 1884.*

*(1) Insanity: evidence. (2) Presumptions. (3) Transactions with deceased persons: Who are parties to actions affecting title to land. (4) Advisory verdict.*

1. The evidence in this case (stated in the opinion) is *held* to show that, at the time of the execution of a deed, the grantor had sufficient mental ability to know what he was doing and the nature of the act done.

2. Lunacy being once established, the burden is on the party claiming through some act of the lunatic, to show that it was done in a lucid interval. And, a return to sanity being proved, the burden is upon the party claiming a relapse into insanity.

3. In an action affecting the title to land, a person claiming under a deed from the defendant which was unrecorded when the notice of *lis pendens* was filed, being bound by the proceedings, is a *party* within the meaning of secs. 4069, 4070, R. S., and cannot be examined as to any transaction or communication by him personally with a deceased person under whom the plaintiff claims title.

4. The verdict of a jury upon the question of the insanity of the grantor, in an action to set aside a deed upon that ground, being merely advisory, is entirely under the control of the court, and a judgment contrary to it may be rendered if the evidence warrants such a judgment.

APPEAL from the Circuit Court for *Crawford* County.

The plaintiff is the son and only heir at law of Charles Wright, late of the city of Prairie du Chien, who died in August, 1865, intestate. April 23, 1864, Charles Wright executed to the defendant (his brother-in-law) a conveyance of a certain house and lot, and another conveyance of his interest — being an undivided half — in four other lots, all in that city. The first deed expresses a consideration of $2,100, and the other of $400. The plaintiff was then about eight years of age. Soon after he reached the age of twenty-one years, the plaintiff brought this action to set aside those deeds because of the alleged insanity of his father when they were executed. Notice of the pendency of the action was duly filed.

When the cause came on for trial (which was in 1878) the court impaneled a jury, to whom the following question was submitted: "Was Charles Wright, on the 23d of April, 1864, at the time he executed the deed to *Robert R. Jackson*, insane and incapable of making such a contract?" After hearing the testimony, the jury returned an affirmative answer to the question. At a subsequent term the court ordered that further testimony be taken; and considerable testimony was thereafter taken by both parties pursuant to such order.

In November, 1882, the circuit court filed his findings of fact which, together with his conclusion of law, are as follows:

"1. That Charles Wright, for a legal and valuable consideration, conveyed the estate mentioned in the complaint to the defendant, *Robert R. Jackson*. 2. That for a valuable

consideration the defendant, on the —— day of ——, 1869, conveyed the same to John Jackson. 3. That, under the circumstances, the disposition of the property by Charles Wright to the defendant, *Robert R. Jackson*, was a proper and judicious disposition of the same. 4. *Non constat* the verdict of the jury, I find that at the time of executing the deed of conveyance to the defendant, the deceased Charles Wright was mentally capable of contracting and fully capable of judging of the force, effect, and propriety of making the contract of conveyance, and that his conveyance to the defendant was his rational act, after full and careful deliberation. 5. I find that the property in controversy is not worth to exceed $1,200. 6. I find that no fraud was practiced by the defendant upon Charles Wright in the purchase of the property from him. 7. I find that the complaint in this action is not sustained.

"I find, as a conclusion of law, that the plaintiff take nothing by his action herein, and that the defendant have judgment against the plaintiff for his costs and disbursements in the action."

Judgment for the defendant dismissing the complaint, and for costs, was afterwards duly entered, pursuant to such findings and conclusion. The plaintiff appeals from such judgment. The case is further stated in the opinion.

For the appellant there were briefs by *Thomas & Fuller*, and oral argument by *Mr. Thomas*. They argued, *inter alia*, that after it had been clearly established that Charles Wright was insane, the burden was upon the defendant to show that the deed was executed during a lucid interval. And the lucid interval must be show at the very time of the act in question. *Ripley v. Babcock*, 13 Wis., 425; *State v. Wilner*, 40 id., 304; *Att'y Gen. v. Parnther*, 3 Brown Ch., 441; *Jackson v. Van Dusen*, 5 Johns., 144; *Hall v. Warrer*, 9 Ves. Jr., 605; *Harden v. Hays*, 9 Pa. St., 151; *Cochran's Will*, 1 T. B. Mon. (Ky.), 263. A deed executed by one *non compos mentis*

is absolutely void; and when one claims under such a deed the fact of the incapacity of the grantor may be shown to defeat such claim although no fraud is alleged and such incapacity had not been legally or judicially determined. *Van Deusen v. Sweet,* 51 N. Y., 378; *Burnham v. Mitchell,* 34 Wis., 128. And it is not necessary first to restore the consideration to the grantee. *Gibson v. Soper,* 6 Gray, 279; *Henry v. Fine,* 23 Ark., 417; *Foss v. Hildreth,* 10 Allen, 76.

For the respondent there was a brief by *Brooks & Dutcher* and *D. Webster,* and oral argument by *Mr. Brooks* and *Mr. Webster.* They argued, among other th ngs, that unless there is inadequacy of consideration, or some other evidence of fraud, imposition, or overreaching clearly made to appear, any degree of imbecility or insanity, short of total business incapacity, will not suffice to avoid a contract. *Hall v. Perkins,* 3 Wend., 626; *Odell v. Buck,* 21 id., 142; *Farnam v. Brooks,* 9 Pick., 212; *Mann v. Batterly,* 21 Vt., 326; *Clearwater v. Kimler,* 43 Ill., 272; *Sheldon v. Harding,* 44 id., 74; *Henderson v. McGregor,* 30 Wis., 78; *Encking v. Simmons,* 28 id., 280. When one has reason to believe that the person with whom he is dealing is competent to transact business, and enters into a contract with him for the purchase of property, which is fair and *bona fide,* and which is executed, and there has been no finding of insanity by a commission, and the property cannot be restored so as to put the parties *in statu quo,* such contract cannot be set aside. *Loomis v. Spencer,* 2 Paige, 153; *Sprague v. Duel,* 11 id., 480; *Beals v. See,* 10 Pa. St., 56; *Encking v. Simmons,* 28 Wis., 284; *Young v. Stevens,* 48 N. H., 133; *Wilder v. Weakley's Estate,* 34 Ind., 184; *Behrens v. McKenzie,* 23 Iowa, 343; *Eaton v. Eaton,* 37 N. J. Law., 108; *Scanlan v. Cobb,* 85 Ill., 296; *Lincoln v. Buckmaster,* 32 Vt., 658; *Curr v. Holliday,* 5 Ired. Eq., 167; *Mut. Life Ins. Co. v. Hunt,* 79 N. Y., 541. Contracts of lunatics are not void, but voidable only, and may afterwards, at lucid intervals or when reason is restored, be

ratified.   2 Kent's Comm., 451; *Jackson v. Gumaer*, 2 Cow., 552; *Jones v. Evans*, 7 Dana, 96; *Breckinridge v. Floyd*, id., 459.   A court of equity ought not to interfere to rescind such a sale as this unless total incapacity is shown.   The true test is an entire inability to know what the act is to which the contract relates, or intelligently to will to do such an act. 1 Wharton & S., Med. Jur., §§ 2, 74; *Titcomb v. Vantyle*, 84 Ill., 371; *Baldwin v. Dunton*, 40 id., 188; *Hovey v. Chase*, 52 Me., 305; *Stewart's Ex'r v. Lispenard*, 26 Wend., 255; *Moffit v. Witherspoon*, 10 Ired. Law, 185; *Armstrong v. Short*, 1 Hawks, 11; *Dennett v. Dennett*, 44 N. H., 531; *Jackson v. King*, 4 Cow., 216; *Blanchard v. Nestle*, 3 Denio, 41; *Searle v. Galbraith*, 73 Ill., 269; *Lewis v. Baird*, 3 Mc-Lean, 56; *Staples v. Wellington*, 58 Me., 453, 459; *Jackson v. Ashton*, 11 Pet., 229; 2 Kent's Comm., 452; *Burnham v. Mitchell*, 34 Wis., 117.

LYON, J.   The controlling question to be determined is, Was Charles Wright of sound mind when he executed to the defendant the conveyances of April 23, 1864, which the plaintiff, his heir at law, seeks by this action to set aside? that is to say, Had he sufficient mental ability to know what he was doing and the nature of the act done?   *Burnham v. Mitchell*, 34 Wis., 117, and cases cited.

It appears that as early as 1841, Mr. Wright, then a resident of the state of New York, became insane.   The only information the record gives us of the particular type of his insanity is that he was in a state of great excitement.   He was placed in an asylum for the insane at Hartford, Connecticut. He remained there a few months, and then returned to his home, apparently well.   He showed no signs of a return of the malady until 1844.   Then he again became excited and unsettled in his mind.   We learn little of his condition from that time until 1846, during which year he was placed in an insane asylum at Utica, New York.   He was doubtless then

insane, and continued so for a year.  He then became so much improved that he was employed in the institution a portion of the time for his board, and a portion of the time he received wages.  After this his malady returned, and he was a patient for several months.  He then became better, and was again employed in the institution under wages until the summer of 1849, when he finally left the asylum.

There is no reason to believe, and nothing in the testimony tending to show, that for the next ten years after he left the Utica asylum he was not perfectly sane.  During that time he was more or less engaged in mercantile business, both as clerk and proprietor.  He was a gentleman of culture and refinement, an expert in music, of irreproachable conduct and manners, was very social, and, withal, had excellent business qualifications.  In 1855 he married a sister of the defendant, removed to Prairie du Chien, and in 1856 became a partner in the mercantile house of Pelton, Wright & Co. That firm consisted of Edward Pelton, Mr. Wright and Orson Jackson, who is a brother of the defendant.  The firm continued in business until 1860.

In the fall of 1859 Mrs. Wright died.  A few weeks later Mr. Wright went to New York and purchased a stock of goods.  On his return to Prairie du Chien he exhibited symptoms of a return of his old malady.  These increased upon him until he became entirely insane, and he had to be watched and guarded constantly, sometimes confined.  After a few months he was taken to some institution for the insane in Michigan, where he remained until the Wisconsin asylum for the insane was opened, about 1861.  He was then placed in that asylum and remained there until early in the year 1864.  Whether he was regularly discharged therefrom or left without a discharge, does not clearly appear, and is not very important.  Dr. Sawyer, then an assistant physician of the asylum, whose deposition was taken on behalf of the plaintiff, speaks of his discharge.  However that may be,

there is no proof that he was discharged as cured. The testimony rather raises a contrary inference, for Dr. Sawyer testified that he was then insane and there was no reason to expect his entire recovery.

After Mr. Wright left the asylum he stopped for some time in Madison, during the session of the legislature of 1864. He complained of the management of the asylum, and seems to have presented a memorial to the legislature for the purpose of procuring the discharge of its officers. During the winter he made one or more visits to Prairie du Chien, and at the close of the session of the legislature, early in April, returned and remained there permanently until he died. After his return to Prairie du Chien his hostility to the officers of the asylum continued, and he wrote articles for publication in the newspapers, reflecting on its management. There is also testimony to the effect that he had strong animosity against his brothers-in-law Orson and John Jackson, the latter of whom was married to Mr. Wright's sister, and with whom the plaintiff lived after the death of his mother.

After the execution of the conveyances in controversy Mr. Wright went to reside with his brother-in-law and sister, Mr. and Mrs. John Jackson, and continued to reside with them until his death. During that time he failed gradually in body and mind. Before he died he became almost imbecile, but his mental infirmity does not seem to have been characterized by the excitement and delusions so marked in the former attacks of his malady.

Numerous witnesses were examined by the respective parties, and a very large amount of testimony taken, relative to the mental condition of Mr. Wright from the time he left the asylum until he died, particularly during the time preceding the execution of the deeds in controversy. This testimony has been read and re-read with the utmost care and attention. We cannot discuss all of it here in detail,

and it would serve no useful purpose to do so. That which is believed to be most important will be hereafter considered. It may be observed, generally, of this testimony that it was taken twelve or fourteen years after the events transpired to which it relates. Some of the witnesses who had formed opinions one way or the other, in 1864, as to the sanity or insanity of Mr. Wright, when they came to testify changed their former opinions. Others testified to their opinions on the subject, when further examination disclosed that they really knew little or nothing of the facts and circumstances upon which alone an intelligent opinion could be formed. Again, some witnesses testified with great positiveness and particularity to casual conversations and isolated facts not of a character likely to impress themselves permanently upon the memory. Besides, on many points of fact the testimony is in direct conflict, as are the opinions of the various witnesses as to the mental condition of Mr. Wright at any given time. This conflict of fact and opinion in the testimony, so much of which is subject to one or more of the infirmities just mentioned, would, were such testimony alone considered, leave the mind in great doubt as to what was the actual mental condition of Mr. Wright when he executed the deeds. Did the testimony furnish no other guide, it is probable that the plaintiff would be entitled to judgment under the rule applied in *Ripley v. Babcock*, 13 Wis., 425, that when the lunacy is once established the burden is on the party claiming through any act of the lunatic, to show that it was done in a lucid interval. In this case the previous insanity of Mr. Wright was established; and the uncertain, unsatisfactory, and conflicting testimony above referred to, standing alone, would be quite insufficient to prove a lucid interval when he made the deed.

But there are facts in the case established by satisfactory evidence, which, we think, furnish a safe guide to correct

judgment. To determine precisely what facts are proved, it is necessary first to dispose of a question of the admissibility of certain testimony preserved in the record.

After the jury returned their verdict the court directed that additional testimony be taken before a referee. This was done. The defendant gave a deposition in which he detailed his transactions and conversations with Mr. Wright pending the negotiations between them for the property, and the consideration he paid therefor. His brother, John Jackson, did the same. The latter is not a party to the action, but at the time of the trial was in possession of the property affected by the action, under an unrecorded deed thereof, executed to him by the defendant in 1869. John Jackson was bound by the judgment in the action, the same as though he had been a party to it. R. S., 823, sec. 3187. Because he is a real party in interest, we think the provisions of secs. 4069 and 4070 extend to him, and hence (with the exceptions specified in the statute) he is incompetent to testify to any transaction or communication had by him personally with Mr. Wright, to the same extent that the defendant of record is incompetent to do so. We shall not attempt to specify here what particular portions of the testimony of these real parties to the action must be excluded under this rule, but no such testimony has been or will be considered by the court in the statement and determination of the case. It may be observed that the greater portion of their testimony is outside the prohibition of the statute, and some of it, coming within the prohibition, is corroborated by other and competent testimony.

We now return to the consideration of the case in certain important aspects disclosed by the proofs, but not before considered. Early in March, 1864, the defendant, who resided in Iowa, at some considerable distance from Prairie du Chien, went to the latter place to attend the funeral of his mother. He there met Mr. Wright for the first time since he became

insane in 1859. This was probably the first time Mr. Wright visited Prairie du Chien after he left the asylum. Learning that Mr. Wright contemplated raising money by placing a mortgage upon his property, and believing it indiscreet for him to do so, and that he was still insane, the defendant presented a verified petition to the county judge of Crawford county, praying the appointment of a guardian for Mr. Wright. The petition is dated and was verified March 3, 1864. It is stated therein that by reason of the insanity of Mr. Wright he was mentally incompetent to have the charge and management of his property. The defendant testified that Mr. Wright consented that this proceeding be instituted, but this testimony was inadmissible under the statute. There seems to be no proof, however, that he took any exceptions to the proceedings, or censured the defendant for commencing them. Presumably, he was not unwilling to have an opportunity to establish his sanity, and there is some competent testimony to that effect. Certainly, he availed himself of the opportunity to do so by contesting the application on the ground that he was not insane.

On his return to Madison, soon after the petition was filed, Mr. Wright was examined by the late Dr. Favill and Dr. Brown, in regard to his mental condition. A reference was ordered by the county court to take depositions in Madison in the matter, and those physicians, together with several other gentlemen, one of whom was Hon. W. W. Field, then speaker of the assembly, gave their depositions. Although Judge BRUNSON, then county judge, could not recollect that these depositions were ever returned to his office, and did not believe they were, yet it satisfactorily appears by the testimony of Mr. Dutcher, the counsel for the defendant in the proceedings, that they were so returned. Also, that they so overwhelmingly established the sanity of Mr. Wright that the proceedings in the matter were discontinued. Mr. Dutcher stated, in substance, that after diligent efforts he

was unable to find any one in Prairie du Chien who was willing to testify to the insanity of Mr. Wright. All this occurred before the execution of the deeds in question,— probably late in 'March or early in April, 1864.

The depositions of Drs. Favill and Brown were taken and read in evidence on the trial of this action. Each testified that he examined Mr. Wright professionally with reference to his mental condition, and both were of the opinion that he was sane. They adhered to that opinion when they gave their depositions thirteen years later. Dr. Favill had the advantage of having known Mr. Wright in the asylum, having been employed therein a few months in 1861, when he was there as an assistant superintendent or physician.

We have not the depositions taken in Madison in the spring of 1864. They seem to have been lost. There was no adjudication by the county court in the matter. Yet the purport of these depositions is sufficiently disclosed to remove any doubt from our minds that had the court proceeded to an adjudication it would have been that Mr. Wright was sane.

The physicians who examined Mr. Wright were gentlemen of high character and standing in their profession, and there is every reason to believe they made a thorough and conscientious examination. There is no ground to think or suspect that Mr. Wright deceived them as to his real mental condition. The cunning which the insane sometimes display to conceal their malady was not a characteristic of his insanity. It does not appear that he ever sought to conceal his mental condition. His excitements, his insane whims and delusions, were manifested freely to all observers. In the labyrinth of conflicting and unsatisfactory testimony which, standing alone, would leave the mind in painful doubt and uncertainty, we have in the result of this professional examination what seems to us to be solid ground upon which to rest our judgment. For the reasons above

stated we are of the opinion that the sanity of Mr. Wright at the time of such examination was fairly established by a clear and satisfactory preponderance of the testimony.

But the learned and ingenious counsel for the plaintiff argued that, conceding all this, it was proved that Mr. Wright relapsed into his former insane condition before he executed the deeds in question. In support of this he calls our attention to the testimony of some of the witnesses to the effect that quite recently before he executed such deeds he manifested animosity towards the Jackson brothers, speaking of them as devils, saying they were trying to get his property, and the like expressions.

It is also urged that after such examination he felt and expressed the same hostility towards the officers of the asylum, and their management of the institution, which was so prominent in his mind while in Madison. It is claimed that this was an insane delusion. The difficulty in the position is that there is no proof to sustain it. It does ñot appear that his criticisms upon the officers and management of the asylum were unfounded in fact. We suppose they were, but the testimony in this case does not authorize us so to determine judicially. See *Chafin Will Case*, 32 Wis., 557.

The animosity which Mr. Wright manifested towards the Jacksons approaches nearer an insane delusion, for the testimony convinces us that they always treated him well, were kind, even generous to him; that they dealt honestly with him, and gave him no occasion for unkind or hostile sentiments towards them. But the testimony tending to show that his animosity towards them still existed when he conveyed his property to the defendant is met by that of other witnesses whose testimony tends to show that during all that time his feelings towards his brothers-in-law were kind and friendly. The infirmities in all this testimony, which make it difficult to give a satis-

Wright vs. Jackson.

factory judgment upon it alone, have been pointed out. But here another important feature of the case presents itself, which greatly aids the solution of the question now under consideration, and also supports the conclusion above stated.

The two deeds to the defendant express, in the aggregate, a consideration of $2,500. *Prima facie* this was the actual consideration paid for the property. The defendant testified fully as to the consideration actually paid by him to Mr. Wright, but considerable of his testimony on that subject was inadmissible under the statute and must be disregarded. We think, however, that there was sufficient competent evidence to prove that Mr. Wright was indebted to the defendant on his promissory note, held and owned by the defendant, on which there was due and unpaid about $750, and that he was indebted to John Jackson on another note, and for money paid by John for his maintenance when in the asylum, amounting in all to about $1,750. John Jackson transferred his note and claim to the defendant, who surrendered both notes to Mr. Wright in consideration of the deeds, and, as we understand, the amount of the above claim also entered into such consideration and was thereby canceled.

The defendant claims that he also paid Mr. Wright $150 in cash as a part of the consideration for the property. Rejecting his own testimony to that effect, there is no direct proof that he did so. Yet it satisfactorily appears that Mr. Wright had no money after he left the asylum, except that he borrowed some of his friends from time to time; that one of his avowed objects in disposing of his property was to obtain means to pay the debts thus contracted; and that after he conveyed his property to the defendant he did pay them, or at least some of them. These facts are very significant and tend strongly to raise a presumption that he must have received some money in part payment for his property. He had no other property of any considerable value, and it

·does not appear that he received money from any other source.

The circuit judge found that the value of the property in controversy does not exceed $1,200. It is argued that this finding is not supported by the testimony. Whether it is or not, the testimony satisfies us that the whole property was worth less than $2,500 when the deeds were executed, and has materially depreciated in value since that time. Hence, the defendant paid for the property more than it was worth. And here it may be remarked that there is no ground for the suspicion that the demands which entered into the consideration paid for the property were not valid, subsisting demands against Mr. Wright, and it appears that he recognized them as such, and, like an honest man, as he was, was desirous and anxious to pay them. It further appears that Mr. Wright deliberated on the subject of making the deeds, and took the advice of a friend, stating to him, intelligently, reasons for doing so. These were a desire to pay his debts, and to retain a home for himself and his boy (the plaintiff) with the Jacksons. So far as we are able to judge from the testimony, it seems to us that, under all the circumstances, he made a very rational and just disposition of his property as well as an advantageous one to himself. He realized for it all that it was worth. He accomplished his desired purpose of paying his just debts to the extent of the consideration; and whether he thereby secured a permanent home for himself and his boy with his brother-in-law and sister or not, he had such home with them until he died, and his boy for an indefinite period afterwards.

The character of the act of Mr. Wright in making the deeds affords very strong evidence that he had not relapsed into insanity when he did so. It was said by Sir WILLIAM WYNNE, in *Cartwright v. Cartwright*, 1 Phill., 90: "I think the strongest and best proof that can arise, as to a lucid interval, is that which arises from the act itself; that I look upon as

the thing to be first examined; and if it can be proved and established that it is a rational act, rationally done, the whole case is proved." Perhaps the rule has not been adopted in later cases as broadly as there stated, but it seems to be well settled that, although the act itself may not be the "strongest and best" proof, yet it is, or may be, strong proof of a lucid interval. 1 Wharton & S. Med. Jur., § 65, and cases cited; *Ripley v. Babcock*, 13 Wis., 425. Here we have an act which Mr. Wright might reasonably have been expected to do were his sanity undoubted. By doing it he accomplished desired and commendable objects. It was a rational act which, so far as we can discover, was done in a rational manner. While we do not say that this proves his sanity at the time, yet it throws light upon the conflicting testimony on the subject, and enables us to find that there is not a preponderance of evidence that Mr. Wright had again become insane when he executed the deeds. We have already seen that a lucid interval a short time before is established by the evidence. The burden was thereby placed upon the plaintiff to show that he had again become insane. We think that he has failed to do so.

Counsel for plaintiff rely upon the case of *Ripley v. Babcock*, 13 Wis., 425, before referred to, claiming that it rules this case. We think otherwise. The mortgage there in controversy was given by the alleged lunatic to secure the debt of his son. He was a man of small means, with a large family of children to support. The mortgage was upon his homestead, which was all the property he had. His son, for whose debt the mortgage was given, was an adult, doing business for himself. The mortgagor had been subject to attacks of insanity for many years, and there was abundant evidence to show that he was not enjoying a lucid interval when he executed the mortgage. Unlike this case, the act was an imprudent, if not an irrational, one, and the party asserting the sanity of the mortgagee signally failed to

prove a lucid interval. The case furnishes no guide for the determination of this case.

Counsel also relies upon some remarks of Sir JOHN NICHOLL in a case in the prerogative court, referred to in 1 Roberts on Wills, 32, as a correct statement of the rule of evidence in cases in which lunacy has been once established. The same remarks are quoted in the opinion by the late Mr. Justice PAINE in *Ripley v. Babcock, supra.* They are as follows: "Positive proof must be given of the disorder having been thrown off for the time, and there must be a complete interval of sanity applying to the particular act in question, for if there was a single word sounding in folly, that was conclusive against the presumption of a lucid interval, to all legal purposes." From the statement in Roberts on Wills, *supra*, the expression used was probably "sounding the folly," and it undoubtedly means that any word evidencing a continuance of the insanity or insane delusion defeats the attempt to show a lucid interval. Of course, it does not mean that any and every foolish or absurd remark of the person whose sanity is in issue will, if he has once been insane, demonstrate that he is still insane. Sane people may and do talk foolishly and absurdly without impeachment of their sanity; and why should a person who is so unfortunate as to have been once insane, be remanded in law to the condition of insanity, with all its disabilities, for doing the same thing, when his words do not necessarily show insane delusion? In this case we are not satisfied that Mr. Wright uttered the "word sounding the folly."

A brief observation as to the effect of the verdict in the case must conclude this opinion, already too long. The verdict is merely advisory *(Jackman Will Case, 26 Wis., 104)*, and is entirely under the control of the court. The court may base its judgment upon it, may set it aside and order another trial of the issue, or may, we apprehend, give judgment contrary to it, if the evidence warrants such a judg-

ment.   In this case we have reached the conclusion that the verdict was against a preponderance of the proofs, and we think the court properly disregarded it,— thus practically setting it aside.   The additional proofs taken after verdict, do not, in our opinion, strengthen the plaintiff's case.

Our conclusion upon the whole case is that when he executed the conveyances in question, Mr. Wright "had sufficient mental ability to know what he was doing and the nature of the act done," and hence that the judgment of the circuit court should not be disturbed.

*By the Court.*— Judgment affirmed.