Barbo vs. Rider, Guardian, etc.

BARBO, Appellant, vs. RIDER, Guardian, etc., Respondent.

*December 15, 1886 — January 11, 1887.*

GUARDIANSHIP: INSANE PERSON. *(1) Evidence. (2) Verdict advisory. (3) Costs on appeal.*

1. The evidence in this case (showing, among other things, that the appellant, whose health had been impaired by excessive drinking, after living happily with his wife for more than twenty years suddenly and without cause conceived the idea that she had been untrue to him; that he charged her therewith, and also charged a number of men with having been criminally intimate with her, repeating the charge to his own children and to all who would listen, and writing an incoherent letter on the subject; that he became sullen and morose, and ceased to take any interest in his family or business, and wandered aimlessly in the fields; that he begged for a division of his property, not comprehending that it all belonged to him; that he refused to take medicine, intimating that his family were trying to poison him; and that he had left his family, taking up his abode elsewhere) is *held* to sustain a finding that the appellant was insane and mentally incompetent to care for himself or his estate.

2. A proceeding under sec. 3976, R. S., to have a guardian appointed for a person insane or mentally incompetent, is equitable in its nature, and the verdict of a jury therein is merely advisory.

3. On appeal by a person adjudged by the county court to be insane or incompetent under sec. 3976, R. S., if the order of the county court is affirmed no judgment for costs should be entered against the appellant and his sureties, but the reasonable expenses of the contestants should be adjusted by the county court and paid out of the estate. R. S. sec. 3981.

APPEAL from the Circuit Court for *St. Croix* County.

This proceeding was instituted under sec. 3976, R. S., by Ole Barbo, a son of the appellant, *Lars Barbo,* who filed in the St. Croix county court his verified petition representing that his father was insane and mentally incompetent to have the charge and management of his property and himself, and praying that a guardian of his person and estate be appointed by the court. Due notice was thereupon given,

and the petition was heard in March, 1885. The appellant appeared and introduced testimony in opposition to the prayer of the petition. The county court found that the. appellant was mentally incompetent and incapable of managing his property and taking care of himself, and appointed the respondent, *Homer Rider*, guardian of his person and estate. The guardian duly qualified, and entered upon the discharge of his duties as such.

The appellant thereupon appealed to the circuit court from the order appointing such guardian. The matter was tried in that court at the May term thereof, 1885, before the court and a jury. The testimony and rulings of the court on the trial are sufficiently stated in the opinion. The jury found that the appellant was insane and mentally incompetent to care for himself or manage his estate. A motion for a new trial was denied, and judgment was entered in accordance with the verdict, affirming the order of the county court from which the appeal was taken, and against the appellant and his sureties in the appeal bond, in favor of the guardian, for costs taxed at $106.59, for which execution is awarded against *Barbo* and his sureties in his appeal-bond. The said *Lars Barbo* appeals from such judgment to this court.

For the appellant there were separate briefs by *H. H. Hayden* and *Armstrong Taylor*, and oral argument by *Mr. Hayden*.

For the respondent there was a brief by *R. H. Start* and *L. P. Wetherby*, and oral argument by *Mr. Start*.

LYON, J. *Lars Barbo*, the appellant, was married to his present wife about the year 1860, in Norway, of which country both are natives. Twelve years later they emigrated to this state, and have since resided here. They have ten children. The appellant owns an improved farm of 180 acres in the town of Baldwin, St. Croix county,

upon which he, with his family, resided nine or ten years, and upon which his family still reside. He also owns stock and other personal property on the farm of the value of $1,200 to $1,500.

The evidence tends to show, and the court and jury might properly have found therefrom, the following facts: *Lars Barbo* is an intemperate man,— a heavy drinker,— and has been such for many years. He frequently became intoxicated. Until about the year 1882 his relations with his wife and children, except when he was drunk, were agreeable, and he was uniformly kind and pleasant to his family. He was industrious and took great interest in his farm and business. For some time before that year his health became poor. He took much medicine for his ailments, and did but little work.

About the year 1882 he conceived the idea that his wife had been and was untrue to him, and from that time an entire change took place in his character and conduct, which became very marked in 1883 and afterwards. He denied that he was the father of three or more of the children his wife had borne to him, and expressed doubts of the paternity of all but one of them. He charged six or more different men, most of them his neighbors, some of whom were never intimate with his family, with criminal intercourse with his wife, and designated two of the children as having been begotten by two of the men so charged. He wrote a letter to each of those men charging him with the crime. He also wrote a long, rambling, indecent letter to the wife of one of those men, making the same charge against her husband. Portions of this letter are almost or quite incoherent. It bears date December 4, 1884. The other letters above mentioned were probably written a short time before. He told the story of the alleged infidelity and shame of his wife to all who would listen to him, even to three of his young sons, and he did this persistently for two years or

Barbo vs. Rider, Guardian, etc.

more.   His sons indignantly denied the truth of these foul
aspersions upon the character of their mother, and many
others to whom he made the charges against her expressed
to him their disbelief of the truth of them.   But still, with
perhaps some few brief intermissions, he persisted in spread-
ing the scandal which involved his own dishonor and the
disgrace of his family as well as the ruin of his wife, until
about the time this proceeding was commenced.

In the spring of 1883, the change in his character and
conduct became more marked and observable.   From being
pleasant and talkative in his family and elsewhere, he be-
came silent, sullen, and morose.   He ceased to take any
interest in his family or business, and threatened to leave
his home.   He importuned his family for a division of his
property, seeming to be unable to comprehend — what they
and others often told him — that it all belonged to him, and
that he could do with it as he pleased, with, perhaps, the
exception of the homestead.   About this time his son Ole,
the petitioner, found him one evening walking rapidly and
aimlessly up and down a field.   Ole went to him, and suc-
ceeded with difficulty in getting him into the house.   He
then wanted to go away, and, the door being closed to keep
him, he opened a window and escaped through it.   He was
finally prevailed upon to return to the house.   A few days
later he left without the knowledge of his family.   Soon
after, one of his sons received a letter from him, mailed in
Dakota, expressing a desire to return home if his family
would forgive his conduct.   His son sent him money, and
he returned.   For a time he seemed better.   This was in
the summer of 1883.   Until the following spring he was
more like his former self.   Then he refused to take medi-
cine for his ailments as he had previously been doing,
intimating that his family were trying to poison him.   He
became again sullen and morose, would not speak even
when spoken to, or answer questions, but wandered about

the neighborhood or fields, keeping away from his house, and growing continually worse, until November, 1884, when he again left his home and family and took up his abode elsewhere. The testimony discloses many other eccentricities of conduct on the part of *Barbo*, from and after 1882, which it is unnecessary to state.

If *Lars Barbo* had no grounds for believing his wife unchaste, we have no doubt that he was the victim of insane delusion. Even if he had some grounds for suspecting that she was unchaste, his conduct was so violent, extravagant, and unnatural it would almost seem that he had brooded over the subject until it unsettled his mind and left him a prey to every wild vagary which his diseased fancy might generate.

Had *Barbo* any reason for believing his wife unchaste when he first conceived that idea in 1882? The learned circuit judge properly excluded all testimony of the general reputation of Mrs. Barbo, but admitted all testimony offered of everything her husband knew or had ever heard concerning her chastity. This testimony may be briefly stated. Thirteen years before the trial, the Barbo family lived in two rooms in Menomonie. During a certain night Mrs. Barbo left the room which she and her husband usually occupied, and went into the other room where her children were sleeping, and remained there until morning. Two other men were sleeping in the room with her husband, and two young men and a young woman were in the room with her children, neither of whom were undressed. They all lay on bedding spread about the floor. The sole witness to this transaction is one Sever Sten, who was one of the young men mentioned. Without testifying directly to the fact, he evidently desired to have it believed that he, and perhaps the other young man, had sexual intercourse there with both the women. On cross-examination, however, he magnanimously admits that he did not see Mrs. Barbo do

anything out of the way that night. Sten then goes on to say that he talked with *Barbo* about this occurrence two years later, and Barbo complained of it and felt bad about it. Yet on his cross-examination he says *Barbo* never told him that he knew of this occurrence! Sten also says that, about twelve years before the trial, he told *Barbo* that his wife had a bad reputation in Norway.

If there is a class of men who would commit perjury rather than have it doubted that they had been the recipients of unlawful sexual favors, it is not difficult to believe, after reading his testimony, that this witness Sten belongs to that class. Probably the jury gave no weight to his testimony. Certainly we do not. If Sten made any such disclosures to *Barbo*, they evidently made no impression upon his mind; for neither Sten nor his male companion figured in *Barbo's* list of adulterers, and no word or act of his, for many years after, shows that he was at all disquieted by the occurrence or attached any significance to it.

About six years before the trial two friends of *Barbo*, one of them his relative, went to *Barbo's* house. One of them went to the field where *Barbo* was, and the other, the relative, remained at the house with Mrs. Barbo, who had only one small child with her. He returned from the field two or three hours later with *Barbo*, and found the relative lying on the bed usually occupied by Mr. and Mrs. Barbo. We find no evidence that *Barbo* made any complaint, or that he regarded the transaction as at all suspicious or improper until years afterwards, and after the change already mentioned had taken place in him. There is proof that some other person told *Barbo* that the reputation of his wife for chastity in Norway was bad; but, when the testimony is scanned, it will be found, we think, that none of these communications were made to him until after the belief that his wife was unchaste fully possessed him. Hence they could not have induced such belief, although they may have added

fuel to the fires of irrational jealousy and suspicion which raged in his disordered brain.

The testimony abundantly proves that there was no foundation in fact for any imputation against Mrs. Barbo's chastity. She seems to have faithfully discharged all her duties as a wife and mother during all her married life; and until 1882, when the change first came over her husband, he made no complaint, but seemed perfectly satisfied with her conduct. Her sons and the most intimate friends of the family utterly disbelieved the charges against her. We cannot doubt that, had the same charges been made against her before 1882, *Barbo* himself would have indignantly repelled them.

We are also satisfied from the evidence that the family of *Barbo* did not interfere with his property any further than was rendered necessary by the disordered condition of his mind and his consequent loss of interest in his own affairs.

So we have here this case: A man marries, and lives with his wife more than twenty years. She bears him ten children. She discharges with fidelity and to the apparent satisfaction of her husband all her duties as a wife and mother. He is fond of his family and pleasant and agreeable to them. Their home is a happy one. He is industrious and greatly interested in his farm and business. But he drinks intoxicating liquor to excess, and his health becomes impaired. Then, without any reason worthy of consideration for a moment, he all at once conceives that the wife of his youth and the mother of his children, she who for a score of years had stood by his side in all love and fidelity, and who had borne her full share of the joint burdens of their lives,— that she had submitted her person to the criminal embraces of a number of men, some of whom she scarcely knew, and that some of these men had begotten children upon her. No argument or protestation of her in-

nocence can shake that belief, and he proclaims it everywhere to all who will listen to him. He tells the cruel tale to his sons, and writes letters on the subject such as only madmen write. He conceives this idea without cause or reason, and persists therein against all reason. He becomes sullen and morose, loses his affection for his children, ceases to care for his farm or business, and finally wanders from his home, refusing longer to remain there. He has a lucid interval, and begs the forgiveness of his family for his conduct. But his malady returns. His family, in their great affliction, strive to save his property from waste and loss, and necessarily assume the control and management of it. He acquiesces in this, not having sufficient reason to know that the property belongs to him and is subject to his disposal, and importunes for a division of it. Because his wishes in this respect are not gratified, he denounces his whole family as being in league against him and suspects that they intend to poison him.

No argument is required to prove that such a change in the nature and conduct of *Barbo*, such unreasonable and unfounded hallucinations respecting the chastity of his wife, and his causeless hostility to his family, which yield to no reason or persuasion, are sufficient evidence that he is the unfortunate victim of insane delusions. Neither is any discussion necessary to show that the case is entirely different from those of *In re Will of Chafin*, 32 Wis. 557; *In re Will of Cole*, 49 Wis. 179, and *Wright v. Jackson*, 59 Wis. 584. Indeed, the doctrine of those cases, applied to the facts of this, lead to the conclusion that *Barbo* is insane.

After reaching this conclusion, it almost necessarily follows that *Barbo* is incapable of managing his estate. It is easy to perceive that in his present condition any artful and unscrupulous person, by humoring his delusions, could get his property from him without difficulty. He is in no condition to care for himself or his estate properly. The court

should not wait until he squanders a portion of his estate before it interferes to preserve the residue. It is enough that the mischief is highly probable to justify the interference of the court to prevent it.

There is some testimony in conflict with that which tends to prove the facts above stated, but we think those facts are proved by a satisfactory preponderance of the evidence, and that the finding of the county court and of the jury in the circuit court (which was approved by that court), and the judgment founded thereon, should not be disturbed on the merits.

It is not probable that *Barbo's* malady is incurable. If he can be kept from the excessive use of intoxicating liquors and is properly cared for, it may reasonably be hoped that his health will be improved if not restored, and that with improved bodily health may come an improved mental condition. Should he so far recover as to be again competent to care for himself and manage his property, on proof thereof the county court will discharge the guardian and restore his estate to him. We doubt not, when it becomes obvious that he has recovered from his malady, his wife and sons and his guardian will gladly join in representing the fact to the county court, to the end that the guardianship may be terminated.

Error is assigned upon the ruling of the court admitting Mrs. Barbo to testify as a witness on the hearing. It would be a cruel rule which seals the lips of a wife when her chastity is impeached, merely because her husband happens to be a party to the proceeding in which she is assailed, while she is not. But, whatever the rule may be, we have disregarded the testimony of Mrs. Barbo in the foregoing statement of the facts proved.

Errors are also assigned upon the charge of the court. We do not discover any fatal error in the charge, although it may be subject to verbal criticism. However, we agree

Barbo vs. Rider, Guardian, etc.

with counsel for the appellant that this proceeding is equitable in its nature, and the verdict is merely advisory. Such seems to have been the ruling of this court in analogous cases. So regarding the proceeding, and finding that the verdict is sustained by a preponderance of the evidence, the charge ceases to be of much importance. Even though it contained error, it should not affect the judgment when the evidence clearly calls for just such a judgment as was rendered.

II. The circuit court gave judgment for costs, and awarded execution therefor against the appellant and his sureties in his appeal from the county court. This is error. The statute provides that " when a guardian shall be appointed for an insane or incompetent person or spendthrift, or for any non-resident, the court shall make an allowance, to be paid by the guardian out of the estate of his ward, for all reasonable expenses incurred by the ward in defending himself against the petition." Sec. 3981, R. S. In addition thereto, all reasonable expenses of the guardian in successfully defending his appointment are also payable out of the estate of his ward. Hence no judgment for costs should have been rendered by the circuit court, but the county court, on a proper showing, should adjust the reasonable expenses of both contestants in that court, in the circuit court, and in this court (which includes services of attorneys), and will direct the guardian to pay the same out of the estate of his ward.

*By the Court.*—The judgment of the circuit court affirming the order of the county court is affirmed. The judgment awarding costs and execution therefor against the appellant and his sureties, is reversed. No costs are allowed in this court, except clerk's fees, which the respondent will pay out of the estate of the appellant in his hands as guardian.