ADA FLORENCE FIRESTINE, Appellant, v. D. W. ATKINSON, Executor, et al., Appellees.

152

MARCH 6, 1928.

REHEARING DENIED JUNE 26, 1928.

*Mays & Mays* and *W. D. Milligan*, for appellant.

*Moore & Moore* and *R. E. Duffield*, for appellees.

FAVILLE, J.—The appellant is the illegitimate child of the testator. She was born in Ohio, in 1868, and lived with her mother until she was 10 years of age. About that time, the mother married, and the parents of the testator kept the appellant in their home for about three years. The appellant bore her mother's name until she was 10 years of age, and after that time, until her marriage, when she was 15 and a half years of age, she was known by the name of the testator. Shortly before the birth of the appellant, the testator left Ohio, and came to Iowa. He was then without means; but by industry and thrift he accumulated a fortune, which it is admitted in the record amounted to at least $125,000 at the time of his death. He was twice married, but no children were born to either marriage. The testator employed his sister and her husband to care for the appellant for a time. The will in controversy was executed October 26, 1911. The testator died June 23, 1926. By his will he disposed of his estate to various relatives, and in respect to the appellant, made the following provision:

"To Ada Florence Firestine, whom it is alleged is my illegitimate daughter, I give and bequeath nothing."

I. The evidence in the record, in the form of proof of letters, declarations, and conduct of the testator,. is sufficient to carry to the jury the question of the recognition by the testator of the paternity of the appellant, and to support a finding that there had been such recognition.

II. The evidence was insufficient to establish appellant's claim of undue influence in the procurement of the execution of said will, and in any event, this question should have been withdrawn from the consideration of the jury.

III. The question as to just what constitutes mental capacity to execute a will is not easy of accurate definition.

In *Perkins v. Perkins*, 116 Iowa 253, we laid down a general rule with regard to the mental capacity required for testamentary disposition of property, as follows:

"His mind may have become debilitated by age or disease, the memory enfeebled, the understanding weak, he may even want the capacity to transact many of the ordinary business affairs of life; but if he has mind enough to understand the nature of the instrument he is executing, to recollect the property he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them, he has testamentary capacity."

This statement has been often repeated by this court. *In re Will of Richardson*, 199 Iowa 1320. It is not seriously contended on this appeal that the testator was so lacking in general mental capacity that he could not transact ordinary business, or did not know his estate and the natural objects of his bounty, and have capacity to exercise a will, and discretion in regard thereto. The evidence was not sufficient to support such a claim. The contention of the appellant, however, is that, at the time of the making of the will, the testator was possessed of an insane delusion in respect to the appellant, and that because thereof he was incapacitated to execute a valid will. In 1 Page on Wills (2d Ed.), Section 151, it is said:

"The insane delusion is frequently the only symptom of insanity, and is confined to a clearly marked set of subjects. This type of insanity is often called monomania, or partial insanity. Monomania is defined as 'insanity upon a particular subject only, and with a single delusion of the mind.' "

See, also, extensive note to *Slaughter v. Heath*, 127 Ga. 747, as reported in 27 L. R. A. (N. S.) 1, 62; *Potter v. Jones*, 20 Ore. 239, and note in 12 L. R. A. 161.

It is not easy to define the characteristics of an insane delusion. It is obvious that it must be something more than a

mere mistake of fact, and also must be a belief that cannot be removed, at least permanently, by evidence. If the belief is based upon evidence, even though it be slight and insufficient, and the belief is erroneous, still it is not an insane delusion. *In re Estate of Henry*, 167 Iowa 557. The courts have recognized many types of insane delusions,—such, for example, as the unfounded belief that the testator's wife was unfaithful to him, and that her children were not his own. *Petefish v. Becker*, 176 Ill. 448 (52 N. E. 71). Also, where the testator wrongly believes that those who would naturally be the objects of his bounty are hostile to him, and where such belief is not based on evidence, and is not removable by evidence, it is regarded as an insane delusion. *Ballantine v. Proudfoot*, 62 Wis. 216 (22 N. W. 392) ; *Burkhart v. Gladish*, 123 Ind. 337 (24 N. E. 118).

Coming to the specific question in hand, it has been held that, where a testator manifests a dislike for the natural objects of his bounty, based on an erroneous belief that such persons have been guilty of misconduct, and where such belief is not based on evidence, and cannot be removed by evidence, it may amount to an insane delusion. In *Hardenburgh v. Hardenburgh*, 133 Iowa 1, we considered a will contest in which it was alleged, regarding the testator, that:

"He, without any foundation therefor, was laboring under the delusion that his daughters were unchaste women, and not fit subjects of his bounty. He, without any foundation therefor, was laboring under the delusion that his daughter Mary Rahm had attempted to, and intended to, poison him; and that he labored under the further delusion that certain of his children had stolen money and other property from him. It is further alleged that all of said delusions caused him to dislike and to become insanely prejudiced against his said daughters, and particularly against Mary Rahm, and that such prejudice caused him to devise all of his property to others."

It was conceded in said case that there was no claim of general mental incapacity, except for the delusions claimed to exist. We said:

"The only other question presented for our determination is whether there is sufficient evidence to support the verdict and judgment. It is almost conclusively shown that the testator

was the subject of the delusions which are said to have existed in his mind, and, from a very careful examination of the evidence, we are fully satisfied that these delusions were insane in their nature and quality. At the time of the contest, the daughters were women well along in years. They were all women of respectability and high standing in the community where they resided. There had been nothing in their conduct, either in their private life or in public, indicating that they were not women of the severest virtue, and yet the charges of unchastity were frequently made against them. It is true, the charges were not made to the public, but were confined to the members of his own family, and oftentimes made directly to the persons accused. * * * It is the general rule that insane delusions existing in the mind of a testator will render invalid a will which is the direct offspring of such delusions, although the general capacity of the testator remains unimpaired. * * * In his will no provision was made for either of the contesting daughters. While it is true, as a general proposition, that one may dispose of his property by will as seems to him best, it is equally true that, where a will absolutely disinherits the children of the testator, it is a circumstance to be considered on the issue of the testator's mental condition. The children of the testator are the natural recipients of his bounty, and, when they are entirely ignored in the disposition of his property, it is *prima facie* an unnatural and unreasonable act. *Bever v. Spangler*, 93 Iowa 576. We think the conclusion inevitable from the record that the will in question was the result of the testator's insane delusions, and that there is no substantial evidence to the contrary.''

In *Zinkula v. Zinkula*, 171 Iowa 287, 305, we said:

''Not all insane delusions render one incapable of making a will. A man may possess all the mental qualities essential to the transaction of even intricate business, and yet have delusions about other matters that do not affect or concern the act which he is required to perform. It is true that, in some instances, delusions have been held sufficient to justify a court in holding that they had controlling force and dominated the action of a testator in making a will. Where it is shown that the delusion is unfounded, and without it, in all probability,

a different course of conduct would have been pursued, or where it is shown that the act of the testator was influenced by the delusion, and that, without such influence operating on his mind, he would have done other than he did, then his act is said to be the result of the delusion, and not a deliberate act of a mind possessing testamentary capacity. Those are cases where it is shown that one has omitted from his will a child who, in the ordinary course of nature, was dear to him, and to whom his natural instincts would have directed the bestowal of his bounty, and it was made to appear that his mind had been falsely poisoned against the child."

See, also, *Baker v. Lewis,* 4 Rawle (Pa.) 356; *Power v. Overholt,* 257 Pa. St. 254 (101 Atl. 733); *Friedersdorf v. Lacy,* 173 Ind. 429 (90 N. E. 766); *Barbo v. Rider,* 67 Wis. 598 (31 N. W. 155); *Snell v. Weldon,* 243 Ill. 496 (90 N. E. 1061); *Rivard v. Rivard,* 109 Mich. 98 (66 N. W. 681, 686).

In *Snell v. Weldon,* supra, the court said:

"The establishment of an insane delusion involves proof that the testator in this case believed certain things concerning his son which did not exist; that he had no evidence on which to base such belief; that the things which he believed were false, and were adhered to by the testator after their falsity had been shown by reasonable evidence; that the things which the testator believed were such things as no person of sound mind would believe; that the testator refused to yield or give up such irrational belief, in the face of such reasonable evidence as would convince an ordinary sound and healthy mind; and, lastly, that the existence of such delusion was present in the mind of the testator and exercised a controlling influence over him at the time the will was executed."

In 1 Underhill on the Law of Wills, Section 94, the author says:

"A mistake of fact, entertained by the testator as to the character and motives of a person who is his heir, which prompts and leads him to disinherit that person, or a strong and perhaps unreasonable prejudice against a person, is not *alone* an insane delusion, destroying testamentary capacity. Thus the fact that the testator believed that his relatives have ill-treated him, or

that they are inimical to him, and have conspired to defraud him, and for that reason leaves his property to strangers, does not constitute an insane delusion, unless it appears that his belief was wholly without *any basis whatever*; and that the testator *obstinately persisted in it against all argument* which may have been employed to dissuade him. If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though, on a consideration of the facts themselves, his belief may *seem* illogical and foundationless to the court; for a will, it is obvious, is not to be overturned merely because the testator has not reasoned correctly.''

In 40 Cyc. 1013, an insane delusion is thus defined:

''An insane delusion is a belief which has no basis in reason and which cannot be dispelled by argument.''

In Schouler on Wills and Administration, Sections 162, 163, it is said:

''Insane delusion should be distinguished from prejudice, or error, as well as from eccentricity. It differs essentially from some rational belief, not well-founded, however perversely the testator may have clung to it. * * * An ill-founded belief, not actually insane, does not destroy testamentary capacity. And where one indulges in an aversion, however harsh, which is the conclusion of a reasoning mind, on evidence no matter how slight or inaccurate, his will cannot on that account be overturned.''

For numerous definitions and illustrations of insane delusions, see, also, 4 Words & Phrases 3645, 3646.

Turning now to the record in this case, we find that, in 1878, the testator wrote a letter to his sister in reference to his ''girl,'' the appellant, saying that he would send money for her clothing and would ''pay her way.'' Again, the same year, he wrote to his parents, referring to having received the picture of the appellant, and expressed a wish to see her, and stated that he would come home soon; that he wanted her to go to school, and would send her money whenever she needed it. In 1880, he wrote to his mother, saying that he would write to the daughter soon, and in 1881, he wrote to the ap-

pellant, telling her she had better go to her aunt's to live, and to get what clothes she needed; to always go in good company, and "be a good girl, and I will stand to [by] you." At the time that the appellant was 13 years of age, the testator's mother died, and the testator attended her funeral, and remained about a month. At that time, the appellant accompanied him to the funeral, and she saw him probably five or six times on his visits in 1885 and 1908. The appellant was married in 1883, in Indiana, and afterwards resided at Fort Worth, Texas, and at the time of the trial, had been residing at Oakland, California, for three years. It appears that the appellant came to Iowa in the summer of 1917, to visit her father; but, as we understand the record, at said time the testator refused to see her or have anything to do with her. The appellant offered the testimony of the witness Gardner, who is a nephew of the testator's and who lived in Ohio until he was about 20 or 21 years of age. At the time of the trial, he was about 50. He testified that he knew appellant and all of the relatives of her family; that he visited his uncle, the testator, about August or September, 1911, and after the death of the testator's wife. His testimony is in part as follows:

"He then seemed much worried; mentioned his will. He made mention of Ada, not inheriting as his daughter, and my mother, and Josephine; and I asked him why this distinction, and he said 'Ada was no good.' The import of his words were that Ada was a very immoral woman. I am not in a position to say it, as he said it, or to use his language. I tried to make him understand that I realized and knew that this was not true. I told him that he had always, in his conversations with me, claimed Ada as his original heir; and he said, 'Well, he knew.' He said he would disinherit Ada for being an immoral child. * * * Later, he visited me in Ohio, and then I came back and visited him again, here in September, after Ada had been here. I was here then about 3 or 4 days. I was with him all that time. We discussed his will. It came up some way, and he said it should be different, and he intended to change it. His attitude then toward Ada was very bitter. He said the same of her he had in 1911; he said she was immoral. * * * In 1922, he spent part of the winter with me in Oklahoma. He again there talked to me about his will,—said he was going

to take care of my little boy, Jim; that he loved Virginia, and was going to try to change his will, unbeknown to the other girls. I spoke to him about Ada, and he said he was still excluding her because she was immoral. I again visited him here two or three years ago, but nothing was then said about the will. One year ago last June, Uncle Ves was at Hot Springs, Arkansas, and he called me there. I was then living at Fairfax, Okla. I went,—it was about 500 miles,—and then he said to me there that the Iowa laws were bothering him about Ada, and that he was afraid Ada would get his property. He said, 'that damn girl,' and 'that God damn girl,'—that is the way he talked about her. He said he did not want her to get his property. I said to him that Ada was his rightful heir, and that I could not conceive why he wanted to cut her out. He said, 'By God,' he knew. I was there about a week with him; then I came here, about ten days before his death, and remained with him until his death. Ada was not talked of at that time. * * * He said Ada was no good, and he knew it."

The court having directed a verdict in behalf of the appellees, we must consider the evidence in the light most favorable to the appellant. It is contended that this testimony shows that the testator was possessed of an insane delusion,—namely, that his daughter was an immoral woman,—and that he intended to disinherit her because thereof. It does not appear that the testator made any explanation to the witness of his claimed basis for such belief, except the oft-repeated statement that "he knew." What it was that "he knew" or thought he "knew,"—upon what, if anything, his statement was based,— nowhere appears in the record. The testimony of the witness Gardner shows that the testator was at least insisting that he "knew" something about the appellant that had turned him against her. The basis for holding that a belief is an insane delusion is that it is harbored without any evidence to support it. The testator being dead, and having failed to offer any explanation or make any statement regarding the facts from which he claimed that he "knew" that appellant was immoral, the appellant was handicapped to prove that the conclusion of the testator was wholly unfounded. But it is elementary that, before a belief of this character can be held to be an insane delusion, it must be established that the belief is wholly false.

It therefore was incumbent upon the appellant at least to establish the fact that the belief expressed by the testator that she was an immoral woman was wholly wanting in foundation, no matter from what source the testator obtained the claimed "knowledge." To meet this requirement, the appellant offered the evidence of a witness who testified that the reputation of appellant while she lived in Ohio, for moral character, was good. It was also stipulated of record that two witnesses would testify that, until the time the will was executed, "and at the time of her marriage, her [appellant's] reputation in the community in which she lived, for moral character, was good, and that, subsequent to the time of her marriage, they have never known of any transgression or charge against her, or the charge that she was an immoral woman." The appellant was recalled in regard to said matter, and testified as follows:

"I was married in 1883. No public charge was ever made against me. I have had church affiliations since 1900."

The question at this point is whether or not, upon this record, a jury could find from the evidence that the testator was possessed of an insane delusion that his daughter was immoral; that he had *no evidence* whatever upon which to rest such a belief or delusion; and that it was wholly unfounded; that he adhered to it after its falsity had been shown by reasonable evidence; that the belief of the testator was such that no person of sound mind would entertain such a belief; and that such delusion was present in the mind of the testator and exercised a controlling influence over him at the very time the will was made.

We are constrained to hold that the evidence is insufficient to carry the case to the jury. The testimony in behalf of the appellant for the purpose of negativing the claimed belief of the testator that she was immoral, as above quoted, is hardly sufficient to carry the question to the jury. This is in no wise a reflection upon the appellant, but it is a very vital and essential part of her case that the proof be so sufficient and preponderant as to establish the fact that the contrary belief, as held by the testator, who protested that he "knew," was so unfounded that it amounted to an insane delusion on his part. Upon the record as made, we are constrained to hold that the

trial court did not err in directing a verdict in behalf of the appellee.

We find no error in the record justifying interference on our part, and the judgment of the district court must be, and it is,—*Affirmed.*

STEVENS, C. J., and EVANS, KINDIG, and WAGNER, JJ., concur.