January Term, 1861.

RIPLEY VS. BABCOCK.

When the lunacy of a mortgagor is once established, it devolves on the party claiming the validity of the mortgage, to show by clear and satisfactory evidence that it was executed during a lucid interval.

APPEAL from the Circuit Court for *Rock* County.

The matter at issue, and the nature of the evidence, is sufficiently stated in the opinion of the court.

*Hopkins & Johnson*, for appellant.

*Knowlton, Prichard & Jackson*, for respondent.

*By the Court*, PAINE, J. This was an action to foreclose a mortgage given by the respondent to secure a debt owed by his son. The defense is that he was insane at the time it was executed. And the only question in the case is, whether this defense was established by the evidence. The court below found that it was; and although this finding was assailed with much force on the argument in this court, yet we have concluded that upon the evidence as a whole we cannot disturb it. We do not deem it necessary to state in detail the impressions made upon us by the testimony of each witness, but will refer generally to the considerations that have led us to this conclusion. In the first place it was admitted that the respondent was shown to have been insane at intervals, for many years. Of this there can be no question. It appears from the testimony of his friends and neighbors, who had all observed the unsoundness of his mind, so that it was a fact well understood among them. It appears also from the same testimony, that one of the prevailing symptoms of the disease was a delusion in respect to his wealth, and an inordinate disposition to make bargains and convey away his property. But while conceding this, the appellant's counsel claimed that it also appeared that the respondent had lucid intervals, and that this mortgage was executed in one of them.

It is true that the witnesses describe his insanity as existing by "fits" and "spells;" but they testify that these "spells" lasted sometimes two, sometimes four, and some-

April 10.

anuary Term,
1861.

RIPLEY
v.
BABCOCK.

times six months. The witness Tuttle states that one year he was in the same condition nearly the whole season. Nor do we think it can be assumed from the testimony, that his insanity existed only during the cold weather and ceased invariably during the warm weather. It is true that some of the witnesses state that he was "generally better" in warm weather. Tuttle says so. But he says also that one season it lasted the whole season, nearly. He says the "insane spells" usually came on in the winter or spring, and lasted from two to four months. If they sometimes did not appear till the spring, it would follow that he must have passed through the cold of winter without them. If when they appeared in the spring they lasted from two to four months, or perhaps to six months, as some of the witnesses testify, they must have extended into the warm weather. So that we think it cannot be assumed that they were invariably present during the cold or absent during the warm weather. And this conclusion is strengthened by the more direct evidence as to the condition of the respondent during the year 1858, to which we shall presently allude.

This mortgage was executed on the 1st of July, 1858. It must be admitted that the testimony of the appellant himself, who never saw the respondent until he came to Madison to live with his son, a few weeks before the execution of the mortgage; of Mr. Firmin, who drew the papers, and saw him only during one or two interviews at his office, while there for the purpose of executing them; and that of Mr. Marston and Kate Babcock, though much of it is of a mere negative character, would tend to show that the respondent was at that time sane. But from the very nature of the inquiry, evidence of this character must be, to a great degree, inconclusive and unsatisfactory to the mind. When it is conceded that but a few weeks before, the brain of the respondent was oppressed by this subtle disease; that it had been so oppressed, with intervals of greater or less degrees of violence, for years; that the same difficulty manifested itself afterwards during the same year and the next; and when it is remembered that the disease often exists without being detected, even by the intelligent and the observing, it is

very difficult, if not impossible, for any mind to pronounce
that it was not present at any particular time, merely be-
cause several intelligent and observing witnesses who had
an opportunity, failed to perceive it. It appears that the
defendant had resided in the town of Magnolia, some miles
from Madison. In January, 1858, his wife died. Not long
after, in the spring, his daughter died. These afflictions,
which often crush, for a time, the soundest minds, were not
without their natural effect on that of the respondent, which,
at its best, was constantly trembling on the verge of insan-
ity. The witnesses agree that in the spring of that year,
and up to the time when he left Magnolia and came to Mad-
ison to reside with his son, he was worse than he had ever
been before. He had eight children then in his family, who
were scantily supplied with bedding. But he traded his
bedding and gave a note for an old corn sheller and a fan-
ning mill, nearly worthless. Some of the witnesses state
that he came to Madison in May, or about the 1st of June.
The plaintiff himself testifies that he came three or four
weeks before the mortgage was executed. This would
have been about the first of June, which must be taken to
have been about the time when he came. Kate Babcock,
the wife of his son, on whose evidence the plaintiff strongly
relies, testifies that after arriving at Madison he seemed
much depressed and melancholy—would sit and read from
morning till night, if they would let him. She says this did
not continue longer than five or six weeks. But assuming
that he came there on the 1st of June, as the weight of evi-
dence would warrant, if it lasted four weeks it would have
continued till the execution of the mortgage. And upon
any construction of the testimony it must have continued
until within a short time of its execution. The counsel for
the plaintiff urged, with much ingenuity, that one of the
strongest symptoms of the respondent's insanity was his dis-
position to talk constantly, and he relied on the absence of
this at about the time the mortgage was executed, to show
his lucid interval. It undoubtedly appears that at certain
stages of his "insane spells" he was much inclined to talk.
But this was not always. On the contrary, he sometimes

fell into the opposite extreme, and was gloomy and silent. This change in the symptoms we believe is well established by the history of this disease, and would seem to be confirmed by common experience and observation. It is a law both of the body and of the mind, that conditions of intense excitement and activity are followed by corresponding conditions of depression. This should naturally be expected in insanity, and it is accordingly found there. It is true this condition would not so naturally attract attention as the one of activity. But it would be very unsafe to assume that the disease was not still present, merely because the symptoms of its active excitement had ceased. Though most of the witnesses dwell more strongly upon the demonstrative symptoms, yet they did not fail to notice the opposite. York testified that he sometimes seemed very dull, and that he could not get much out of him. Our conclusion that he was in this condition from the time he came to Madison until at or after the execution of the mortgage, is further corroborated by the testimony of Cook, one of his neighbors. He swears that he saw him in Madison about the 1st of July, that he seemed quite melancholy, shed tears, spoke of his family, but did not say much. York testifies that he saw him in August or September following, and it is evident from his conversation at that time that the other phase of his insanity was then present. Upon the whole, with this conceded cloud over the respondent's intellect, both before and after the execution of the mortgage, we are unable to say that the evidence has so lifted the veil that we can look into the secret workings of his mind and say that it was not darkened at that moment.

Our conclusion derives some support from the testimony of the defendant himself. It seems to be conceded that he was sane at the time it was taken, and he says he has no recollection whatever of having executed this mortgage. It appears that a failure to remember what took place during his insanity, had been previously noticed by the witness Tuttle.

We think it also derives some support from the nature of the act itself. He was a man of limited means, having no

property but this homestead. He had quite a large family of children, some of them young. He mortgaged his homestead to secure the debt of a son who was of age, and carrying on business for himself. There is, it is true, nothing extraordinary in this. It might well be explained by the promptings of paternal affection. Still, in view of the defendant's circumstances, and the condition of the rest of his family, it was imprudent, to say the least, as the result has shown. And in respect to the capacity of a lunatic to make a will, great stress is laid on the nature of its provisions, in determining whether or not it was made in a lucid interval. For the lunacy being once established, the burden is on the party claiming through any act of the lunatic, to show that it was done in a lucid interval. In such cases, it is said, "positive proof must be given of the disorder having been thrown off for the time, and there must be a complete interval of sanity applying to the particular act in question, for if there was a single word sounding in folly, that was conclusive against the presumption of a lucid interval, to all legal purposes." 1 Roberts' Law of Wills, case of F. E., 32; Stock on Law of Non Compotes Mentis, 51 (23 Am. Law Library).

For these reasons, without noticing more particularly the items of evidence relied on as indicating sanity, we think the judgment of the circuit court must be affirmed, with costs.