IN RE the ESTATE OF Nickolas J. PERSHA, Deceased:

Mary J. GITTEL, Appellant-Cross-Respondent,

v.

Ruth M. ABRAM, Respondent-Cross-Appellant.†

Court of Appeals

*No. 01–1132. Submitted on briefs December 7, 2001.—Decided April 25, 2002.*

2002 WI App 113

(Also reported in 649 N.W.2d 661.)

† Petition to review denied 9-26-02.

On behalf of the appellant-cross-respondent, the cause was submitted on the briefs of *Charles H. Barr* of *Croen & Barr LLP*, Milwaukee, and *Thomas C. Wilkoski* of *Lucas & Wilkoski*, West Allis.

On behalf of the respondent-cross-appellant, the cause was submitted on the briefs of *Christopher J. Blythe* of *Lawton & Cates, S.C.*, Madison.

Before Vergeront, P.J., Dykman and Lundsten, JJ.

¶ 1. VERGERONT, P.J. This appeal arises out of a contest over the will of Nickolas Persha. Ruth Abram, the only beneficiary under the will and the personal representative, sought to have the will admitted to probate. One of Persha's siblings, Mary Gittel, objected on the grounds that Persha lacked testamentary capac-

ity to make a will and the will was the result of Abram's undue influence. The trial court ruled that Persha lacked testamentary capacity, Abram had failed to rebut the presumption of undue influence, and the will should not be admitted to probate, and it ordered Persha's estate to proceed intestate. Subsequently, the court rescinded that portion of its Decision and Order regarding undue influence and ordered that Abram's costs and attorney fees be reimbursed from the estate under WIS. STAT. §§ 879.35 and 879.37 (1999–2000).[1] Gittel appeals this order, contending that the court lacked the statutory authority to rescind the portion of its earlier Decision and Order regarding undue influence, and that the trial court's implicit finding that Abram propounded the will in good faith is clearly erroneous.

¶ 2. We hold that the trial court had the authority under WIS. STAT. § 806.07(1)(h) to rescind the portion of its Decision and Order regarding undue influence even though that did not change the ultimate order that the estate should proceed intestate. We also hold the trial court had the authority to do so on its own motion as long as both parties had adequate notice.

¶ 3. With respect to the court's decision that Abram is entitled to have the estate pay her costs and attorney fees under WIS. STAT. §§ 879.35 and 879.37, we conclude the trial court did not adequately explain its implicit—and necessary—finding that Abram acted in good faith in propounding the will, nor the relationship between that implicit finding and other apparently inconsistent findings.

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

¶ 4. Accordingly, on the appeal we affirm the court's order rescinding the portion of its Decision and Order regarding undue influence, but we reverse the order that the estate pay Abram's costs and attorney fees and remand for further consideration of Abram's good faith in propounding the will.

¶ 5. Abram cross-appeals, challenging the trial court's determination that Persha lacked testamentary capacity. She contends the trial court erroneously shifted the burden to her by applying a rebuttable presumption that Persha lacked testamentary capacity at the time he executed the will. We conclude that, although the court erred in stating that there was a rebuttable presumption, its actual analysis applied the correct legal standard and is supported by the record. Accordingly, on the cross-appeal we affirm the trial court's judgment that the will not be admitted to probate because Persha lacked testamentary capacity.

### APPEAL—COURT'S AUTHORITY UNDER
### Wis. Stat. § 806.07(1)(h)

### Background

¶ 6. Persha executed a will on January 26, 1999, leaving his entire estate to Abram, who had lived with him for twenty-three years. Persha was seventy-seven years old and was suffering from cancer in the fluid surrounding his brain. He had been admitted to Milwaukee Veteran's Administration Hospital on January 19, 1999, remaining there until his death on February 16, 1999.

¶ 7. After a five-day trial, the trial court on December 20, 2000, issued a lengthy Decision and Order[2] on Gittel's contention that Persha's will should not be admitted to probate because he lacked testamentary capacity and was subjected to Abram's undue influence. At the end of a nineteen-page discussion of the law and the evidence, the Decision and Order stated:

## FINDINGS OF FACT

1. Nickolas Persha's Will of January 26, 1999 was properly executed . . . .

2. There is clear, satisfactory, and convincing evidence that Mr. Persha lacked testamentary capacity on January 26, 1999.

3. The proponents of the Will have failed to show that on January 26, 1999, that Mr. Persha had a "lucid interval."

4. There is clear, satisfactory and convincing evidence that Ruth Abram and Mr. Persha had a confidential or fiduciary relationship and that there were suspicious circumstances surrounding the preparation and execution of the Will. There is a rebuttable presumption of undue influence. The proponent of the Will has failed to rebut that presumption.

## CONCLUSIONS OF LAW

The proposed Will of Nickolas Persha dated January 26, 1999, shall not be admitted to probate.

Therefore, it is **ORDERED** that the Estate of Nickolas Persha shall proceed intestate.

---

[2] The document is titled "Memorandum Decision and Order," but for brevity's sake, we refer to it as "Decision and Order."

¶ 8. Subsequently, the court entered a judgment stating the will would not be admitted to probate, the estate would proceed intestate, and Gittel would be awarded all statutory costs and disbursements. Abram filed an objection to Gittel's bill of costs on a number of grounds and also argued that Gittel's costs should be paid by the estate, not by her, because she propounded the will in good faith.[3] At the same time, Abram moved that her costs and attorney fees be paid by the estate under WIS. STAT. §§ 879.35 and 879.37[4] because she had propounded the will in good faith.

¶ 9. The court asked for briefing on the issue "whether the Court's findings on undue influence prevents Ms. Abram from recovering costs and attorney fees under Sec. 879.35 and 879.37 Wis. Stats." Gittel argued that because of the finding of fact on undue influence, Abram was precluded from recovering costs

---

[3] WISCONSIN STAT. § 879.33 provides that the costs of a prevailing party may be "paid by the losing party or out of the estate as justice may require."

[4] WISCONSIN STAT. § 879.35 provides:

> **Costs in will contests.** Costs may be awarded out of the estate to an unsuccessful proponent of a will if the unsuccessful proponent is named as an executor therein and propounded the document in good faith, and to the unsuccessful contestant of a will if the unsuccessful contestant is named as an executor in another document propounded by the unsuccessful contestant in good faith as the last will of the decedent.

WISCONSIN STAT. § 879.37 provides:

> **Attorney fees in contests.** Reasonable attorney fees may be awarded out of the estate to the prevailing party in all appealable contested matters, to an unsuccessful proponent of a will if the unsuccessful proponent is named as an executor therein and propounded the document in good faith, and to the unsuccessful contestant of a will if the unsuccessful contestant is named as an executor in another document propounded by the unsuccessful contestant in good faith as the last will of the decedent.

and attorney fees under *Bethesda Church v. Menning (Estate of Christen)*, 72 Wis. 2d 8, 22, 239 N.W.2d 528 (1976) (finding of undue influence disqualifies proponent from asserting "good faith" under Wis. Stat. §§ 879.35 and 879.37). Abram argued that the court's entire discussion of undue influence in the Decision and Order was "non-binding dicta" because the court preceded its discussion of undue influence with this statement: "It is not necessary for the court to reach the issue of undue influence by reason of the Court's decision concerning testamentary capacity. However, the Court will briefly discuss undue influence."

¶ 10. The court held a hearing on Abram's motions on February 26, 2001. At the beginning of the hearing, the court asked Abram's attorney whether the court was correct in assuming that Abram was asking the court to rescind the portion of the Decision and Order regarding undue influence, and Abram's attorney answered yes.

¶ 11. At the close of the hearing, the court stated that in its Decision and Order it had not considered the factors that might rebut the presumption of undue influence; however, when Abram brought her motion, it reviewed the law. The court concluded that, in deciding whether the presumption of undue influence was rebutted, it could consider evidence other than that which directly contradicted the suspicious circumstances, such as evidence that Abram had been Persha's constant companion for over twenty years, in essence a "common law wife," that she daily cared for him in the hospital, and that she was "the natural object of Nick Persha's bounty." The court also noted that at least one friend had testified that Persha had told him of his desire to leave Abram his estate. The court found that if Persha had drafted a will when he was competent, he

would have left most, if not all, of his estate to Abram. This evidence, the court concluded, was sufficient to rebut the presumption of undue influence. The court stated that if its earlier decision stood—that the presumption was not rebutted—it would result in financial hardship and serious inequity to Abram. Therefore, the court stated, "to the extent that my December 20, 2000 findings regarding undue influence indicate there was undue influence, those findings are hereby rescinded."

¶ 12. The court also concluded that it would be a manifest injustice to make Abram responsible for her own costs and attorney fees and for her to have to pay Gittel's costs and attorney fees. The court therefore ordered that the estate reimburse Abram for her costs and attorney fees and that Gittel's costs and attorney fees be paid by the estate, not by Abram.[5]

¶ 13. Gittel filed a motion for reconsideration arguing that the twenty-day time period within which the court could reconsider its decision under WIS. STAT. § 805.17(3)[6] had expired. The court denied the motion. It ruled that § 805.17(3) did not limit its authority to grant relief from judgment under WIS. STAT. § 806.07(1)(h) when the reasons justifying relief

---

[5] The court entered a written order on March 7, 2001, ordering that the portion of its decision regarding undue influence was rescinded, and ordering that Abram's costs of $2,851.22 and attorney fees of $47,330 be reimbursed by the estate.

[6] WISCONSIN STAT. § 805.17(3) provides in relevant part:

> (3) RECONSIDERATION MOTIONS. Upon its own motion or the motion of a party made not later than 20 days after entry of judgment, the court may amend its findings or conclusions or make additional findings or conclusions and may amend the judgment accordingly.

are apparent to the court, and that relief was appropriate under the latter statute.

## Discussion

¶ 14. Gittel contends the trial court erred in ordering that Abram's costs and attorney fees be reimbursed because Abram did not act in good faith in propounding the will as required by WIS. STAT. §§ 879.35 and 879.37. She argues that the trial court's finding of undue influence precludes a finding of good faith, and the court lacked authority under WIS. STAT. §§ 806.07 and 879.31 to rescind that finding.[7]

¶ 15. WISCONSIN STAT. § 806.07(1)(h) provides:

> **Relief from judgment or order. (1)** On motion and upon such terms as are just, the court, subject to subs. (2) and (3), may relieve a party or legal representative from a judgment, order or stipulation for the following reasons:
>
> . . . .
>
> (h) Any other reasons justifying relief from the operation of the judgment.

WISCONSIN STAT. § 879.31 adopts § 806.07 in probate proceedings and provides: "On motion, notice to adverse parties and hearing, the court may relieve a party or legal representative from a judgment or orders of the court or the party's stipulation as provided in s. 806.07."

¶ 16. Gittel argues that WIS. STAT. §§ 806.07(1) and 879.31 do not provide the court with authority to

---

[7] Alternatively, Gittel argues that, even if the rescission of that finding was authorized, the court's implicit finding that Abram acted in good faith is clearly erroneous. We address this alternative argument in the last section of this opinion.

amend its December 20 Decision and Order as it did for three independent reasons: (1) the statutes authorize relief only from a "judgment, order, or stipulation" and the court did not amend the order or the judgment but only amended findings of fact;[8] (2) the statutes do not authorize the court to act on its own motion; and (3) a court may not act under §§ 806.07 and 879.31 unless the parties have advance notice, and she did not.

■■■

¶ 17. The issues of statutory interpretation presented by these arguments are questions of law, which we review de novo. *State v. Isaac J.R.*, 220 Wis. 2d 251, 255, 582 N.W.2d 476 (Ct. App. 1998). The aim of statutory construction is to ascertain the intent of the legislature, and our first resort is to the language of the statute itself. *Id.* If the words of the statute convey the legislative intent, that ends our inquiry. *Id.* However, if the language of the statute is ambiguous or unclear, the court examines the scope, history, context, subject matter, and the object of the statute in order to ascertain the intent of the legislature. *Id.* at 255–56. A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses. *Id.* at 256. Whether a statute is ambiguous is a question of law. *See id.* at 255–56.

1. *Whether* Wis. Stat. *§ 806.07 authorized the court to amend factual findings.*

■■

¶ 18. Gittel's first argument presumes that only the language following "Therefore, it is ORDERED . . ."

---

[8] For purposes of this argument, it is not necessary to distinguish findings of fact from conclusions of law, because Gittel's argument is the same for both.

in the December 20 Decision and Order is an "order" within the meaning of Wis. Stat. § 806.07. While this may be a reasonable construction of "order," we conclude it is not the only reasonable interpretation. It is also reasonable to construe "order," as well as "judgment," as encompassing all the findings of fact and conclusions of law the court makes in arriving at the order or judgment, and we conclude this is more reasonable for the following reasons.

¶ 19. There is no uniform prescription for how much of the decisional underpinnings (that is, findings of fact and conclusions of law) are contained in the portion of a document labeled "order," or a document titled "judgment." The portion of the Decision and Order in this case that follows "Therefore, it is ORDERED . . ." could just as properly have said: "Therefore, it is ORDERED that, because Nicholas Persha lacked testamentary capacity on January 26, 1999, and because Ruth Abram exercised undue influence, the January 26, 1999 will shall not be admitted to probate and his estate shall proceed intestate." Similarly, the document labeled "Judgment" could also have contained the court's determination on testamentary capacity and undue influence.

¶ 20. The evident purpose of the statute is to provide relief to a party, in certain situations, from the adverse effect of a court's decision or of the party's own agreement. Where a court's determination that a party exercised undue influence has an adverse effect on a party, and the party can otherwise meet the statutory requirements for relief, it makes little sense to prohibit a party from doing so simply because that determination is not contained in the "order" portion of a decision and order or a judgment. Moreover, a stipulation may

781

contain agreements to facts and agreements to legal propositions. Certainly if the parties had stipulated that Abram had exercised undue influence, she could have sought relief from that stipulation. We see no reason why the legislature would intend to authorize a court to grant relief in that case, but not when the court itself determined there was undue influence.

¶ 21. We also do not agree with Gittel that *Grodin v. Smith (Estate of Smith)*, 82 Wis. 2d 667, 676–77, 264 N.W.2d 239 (1978), suggests the trial court may not amend the finding of undue influence simply because the amendment does not change the will's inadmissibility to probate. *Estate of Smith* simply does not address this question, because there the trial court did vacate findings of fact, conclusions of law, and the judgment. *See id.* at 669.

¶ 22. However, *Estate of Smith* is helpful because it does make clear that the trial court does have the authority to act under WIS. STAT. § 806.07(1)(h) when, upon further consideration, it decides that its decision was incorrect. *Estate of Smith*, 82 Wis. 2d at 674, 676–77.

¶ 23. Gittel also contends that one reason to conclude the trial court in this case did not have the authority to act under WIS. STAT. § 806.07 is that otherwise we undermine the twenty-day limitation on reconsideration under WIS. STAT. § 805.17(3). However, the court in *Estate of Smith* expressly held that the trial court there was authorized under § 806.07(1)(h) to reconsider its initial findings of fact, conclusions of law, and judgment even though the time for acting un-

der § 805.17(3) had expired.[9] *Estate of Smith*, 82 Wis. 2d at 672–73. Accordingly, a concern with the time limit in § 805.17(3) is not a reason for limiting the authority of a trial court to act under § 806.07(1)(h) to correct its errors.[10]

2. *Whether* WIS. STAT. *§ 806.07 authorizes the court to act sua sponte.*

¶ 24. Gittel's second major argument is that WIS. STAT. § 806.07 does not authorize the court to act on its own motion. We conclude that the plain language "On motion . . . the court . . . may . . ." encompasses a motion by the parties or the court. Generally, a court has the authority to raise an issue sua sponte if it gives the litigants notice that it is considering the issue and an opportunity to argue. *State v. Holmes*, 106 Wis. 2d 31, 40–41, 315 N.W.2d 703 (1982). The evident purpose of § 806.07 is to give a court authority to provide relief on equitable grounds, *see State ex rel. M.L.B. v. D.G.H.*, 122 Wis. 2d 536, 542, 363 N.W.2d 419 (1985), and the catch-all in para. (h) shows that the enacting body intended this authority to be broad, *see Conrad v. Conrad*, 92 Wis. 2d 407, 418, 284 N.W.2d 674 (1979).

_____

[9] When *Estate of Smith* was decided, WIS. STAT. § 805.17(3) had a ten-day limitation. *Grodin v. Smith (Estate of Smith)*, 82 Wis. 2d 667, 673 n.1, 264 N.W.2d 239 (1978).

[10] Gittel also argues that the trial court's failure to act within the twenty days required by WIS. STAT. § 805.17(3) is an independent basis for reversing the trial court. However, because of our interpretation of WIS. STAT. § 806.07(1)(h), it is unnecessary for us to resolve the parties' dispute over the application of that statute.

There is no logical reason to prevent the court from initiating sua sponte a consideration of relief under the statute.

¶ 25. Gittel points out that WIS. STAT. § 805.17(3) expressly provides that a court may act under that statute on its own motion ("Upon its own motion or the motion of a party . . . the court may . . . .") and argues that the absence of this language in WIS. STAT. § 806.07 shows the supreme court did not intend to authorize the court to act on its own motion under that statute. We disagree.

¶ 26. There is a rule of statutory construction that different word choices in different parts of the same statute, particularly within the same section, may create an inference that the enacting body intended different, distinct meanings. *American Motorists Ins. Co. v. R & S Meats, Inc.*, 190 Wis. 2d 196, 214, 526 N.W.2d 791 (Ct. App. 1994). This rule rests on the premise that it is logical to assume the enacting body had the entire statute or section in mind when it chose the different words. Gittel, however, provides us with no basis for assuming that the wording of WIS. STAT. § 806.07 was chosen with the different wording of WIS. STAT. § 805.17(3) in mind. Indeed, the history shows that when first enacted, § 805.17(2), now § 805.17(3), provided: "Upon motion of a party . . .," S. CT. ORDER, 67 Wis. 2d 585, 712 (eff. Jan. 1, 1976); § 806.07, in contrast, provided "On motion . . .," as it currently does, S. CT. ORDER, 67 Wis. 2d 585, 726. The words "its own motion or the" were added to § 805.17(3) in 1991. S. CT. ORDER, 160 Wis. 2d xiii, xiv (eff. July 1, 1991). This history supports our reading of § 806.07: because the language of § 806.07 never qualified the phrase "[o]n motion" with "of a party," as

did § 805.17(3) (originally enacted as § 805.17(2), *see* S. Ct. Order, 73 Wis. 2d xxxi, xxxvi (eff. Jan. 1, 1977)), it was not necessary to add language to § 806.07 to include the court.[11]

¶ 27. In holding that a court may act on its own motion under Wis. Stat. § 806.07, we emphasize that when a court does so, the parties must have notice and the opportunity to be heard. Because the party who wishes to oppose relief under § 806.07 has the same opportunity to do so whether the court or the other party initiates consideration of relief, there is, as we have already indicated, no logical reason to read in a prohibition on the court initiating the consideration.[12]

3. *Whether Gittel had adequate notice.*

¶ 28. Gittel's third argument is that she did not have notice that the court intended to modify the Deci-

---

[11] Although we may not use legislative history to create an ambiguity, we may use it to support the plain language of the statute. *Novak v. Madison Motel Assocs.*, 188 Wis. 2d 407, 416, 525 N.W.2d 123 (Ct. App. 1994). Here, we use it only to show the deficiency in Gittel's argument based on the language of Wis. Stat. § 805.17(3).

[12] In *Lyman v. Lyman*, 184 Wis. 2d 124, 137, 516 N.W.2d 767 (Ct. App. 1994), we stated that "the court [there] *should not* have proceeded under [Wis. Stat.] § 806.07 because neither party had filed a motion for modification under § 806.07, neither party had notice that such a motion would be entertained, and neither party was prepared to argue that motion." We agreed with the appellant in *Lyman* that the court's action "took him by surprise." *Id.* This ruling is not inconsistent with our conclusion in this case that a court may properly raise the issue of relief under § 806.07 sua sponte as long as the parties have adequate notice.

sion and Order. It is true that Abram's motion did not apprise Gittel that the issue of modification of the Decision and Order would be addressed at the hearing. However, the court's questions to Abram's attorney at the beginning of the hearing unmistakably informed Gittel's counsel that the court was considering a modification.[13] Gittel's attorney had the opportunity before the court ruled to object to the lack of notice and request a postponement, but did not. In any event, Gittel is not arguing on appeal that the evidence does not support the court's change in the finding on undue influence.

¶ 29. We agree that Gittel did not have notice and the opportunity to be heard on the specific issue of the court's authority under Wis. Stat. § 806.07, because the court did not refer to § 806.07 until the written order denying Gittel's motion for reconsideration without a hearing. However, Gittel does not point to any argument she would have made in the trial court regarding that court's authority under § 806.07 that she cannot fully address on appeal. We have decided de novo all the issues regarding § 806.07 she has raised on appeal, and we have decided them against her. We therefore conclude she has not been prejudiced by the lack of notice and opportunity to be heard in the trial court on that court's authority under § 806.07.

---

[13] Gittel argues that she was entitled to notice of this issue at least five days prior to the hearing. However, the statute on which she relies, Wis. Stat. § 801.15(4), applies to a "written motion." Wisconsin Stat. § 802.01(2) specifically excepts motions made during a hearing or trial from the requirement that a motion be in writing. Thus, the rules of civil procedure contemplate that a motion may be made orally during a hearing.

## CROSS-APPEAL—TESTAMENTARY CAPACITY

### Background

¶ 30. In its decision that Persha lacked testamentary capacity at the time he executed the will, the trial court explained that it gave substantial weight to the medical testimony, which included that of Persha's treating physician, Dr. Davis, and the admitting physician, Dr. Hower. Dr. Davis, who saw Persha on a daily basis in the hospital, testified, based on his personal observations, that although Persha's "mental status fluctuated at times," Persha "remained basically disorientated."[14] Dr. Davis's opinion was that Persha "would have had difficulty in understanding how to manage his daily affairs . . . includ[ing] making a legal document" during his entire stay at the hospital. Three days before Persha executed the will, Dr. Davis asked Persha's sister for her consent for a medical procedure because he felt Persha was unable to give meaningful consent, and did not seem to comprehend the nature of having the procedure.

¶ 31. Dr. Hower, who cared for Persha on a day-to-day basis at the hospital, testified that when she admitted him into the hospital, Persha did not know where he was. Subsequently, he showed signs of deliriousness, and he was put in restraints because he did not realize that he could harm himself by pulling out his IV tubes. She agreed that Persha was not able to give consent to the medical procedure performed three days before execution of the will because he was not able to make decisions, and was not able to "understand the

---

[14] Dr. Davis had been trained in evaluating a patient's mental status and had done so for more than twenty-five years. He had treated Persha since Persha was admitted to the hospital on January 19, 1999.

good and bad consequences of the decision he makes." Both doctors testified that cancer in the fluid around the brain can cause confusion and disorientation.

¶ 32. The trial court also relied on the medical records and daily progress notes that reported and gave specific examples of Persha's confusion and disorientation in the days after his admission to the hospital and before the date of the execution of the will. And the court credited the testimony of Reuben Gittel, who knew Persha well and visited Persha on January 20, 1999. Reuben Gittel testified to the nonsensical things Persha did and said during that visit, stating that Persha did not know where he was, "didn't know him, [Reuben,] half the time," and just stared in response to some questions.

¶ 33. Based on this evidence,[15] the court found there was clear, convincing, and satisfactory evidence that, prior to the execution of the will, Persha "suffered from mental lapses of the type that stood to [a]ffect his testamentary capacity before execution of the will on January 26, 1999." Relying on *Sorensen v. Ziemke (Estate of Sorensen)*, 87 Wis. 2d 339, 274 N.W.2d 694 (1979), the court stated that "a presumption [therefore] has been established that Mr. Persha's lack of testamentary capacity was ongoing." Again relying on *Estate of Sorensen*, the court framed the next question as whether Abram was able to "rebut the presumption of incapacity by showing that Mr. Persha had a 'lucid interval.' " The court emphasized that the critical inquiry was whether, in spite of Persha's general mental condition of being confused and disoriented, he did, at the time of the execution of the will, have an interval in

---

[15] The court stated that this was not an exhaustive discussion of evidence showing Persha's diminished mental capacity.

which he possessed testamentary capacity. The court found the time of execution of the will to be approximately 12:30 p.m. or 1:00 p.m. on January 26, 1999.

¶ 34. The court then recounted the evidence of the several doctors, including Dr. Davis and Dr. Hower, and the several nurses caring for Persha that consistently showed he continued to be confused and disoriented on January 26—not oriented to time and place, not able to carry on a conversation, and not understanding what was going on. The court explained that it attached particular weight to the nurses' testimony, because they had the most regular and frequent contact with Persha. One of the nurses caring for Persha on January 25 and 26 testified that she would not have witnessed a will for a person in Persha's condition on January 26 because he would not understand. Another nurse, who did assessments of Persha's mental ability because he was in restraints, testified that at noon, 1:00 p.m., and 2:00 p.m. on January 26 Persha was confused and disoriented, and she did not think he was capable of understanding the will's content.

¶ 35. The court also relied on Reuben Gittel's testimony of Persha's condition on January 26. Reuben visited him at approximately 10:00 a.m. and testified that Persha seemed not to know "where he was or who he was."[16]

---

[16] The court also found very credible and placed great weight on the testimony of Pastor Richard Aiken: he had known Persha for forty-five years and visited him at 1:30 p.m. on January 25, 1999. Persha did not recognize him and told him that the day before his (Persha's) nephew had visited Persha and they had gone to the farm together. None of that had happened. Pastor Aiken believed that Persha was unable to sign any legal document on January 25, 1999.

¶ 36. The court discounted the testimony of the only medical witness who testified that Persha had the mental capacity to execute a will, because that doctor had never seen nor treated Persha and could not testify to a reasonable degree of medical certainty that Persha knew what property he owned. The court also found that the two hospital social workers who witnessed the will did not have an adequate basis on which to express a meaningful opinion about Persha's testamentary capacity: their only prior contact with Persha had been for one or two minutes prior to January 26, 1999, and at the time of the execution of the will, they did not ask him any questions to determine what he understood, they knew little or nothing about his medical condition, and they did not have a good recollection of the will signing.

¶ 37. Finally, the court found that Abram's testimony on her conversation with Persha after the will was signed—that Persha told her why he wanted her to have the property and what she was to do concerning a funeral, selling some property, and the leases—was not credible. The court based this assessment on the fact that Abram told no third party about this conversation and made no effort to show to the witnesses of the will that Persha knew what he was doing, even though she knew Persha was disoriented and knew his sisters would not like the will and would contest it.

¶ 38. Based on its assessment of the evidence, the court concluded that Abram had not proved a "lucid interval," and therefore "failed to rebut the presumption that Mr. Persha's lack of testamentary capacity continued on the date the will was executed."

## Discussion

¶ 39. Abram contends the court erred in shifting the burden to her to show that Persha had a lucid interval at the time he executed the will, because that is not the ruling of *Estate of Sorensen*. Had the court applied the correct standard, she asserts, the result would be a determination that Persha had testamentary capacity at the time he executed the will.

¶ 40. The standard for testamentary capacity is well-established:

> The testator must have mental capacity to comprehend the nature, the extent, and the state of affairs of his property. The central idea is that the testator must have a general, meaningful understanding of the nature, state, and the scope of his property but does not need to have in his mind a detailed itemization of every asset; nor does he need to know the exact value of his property . . . . The testator must know and understand his relationship to persons who are or who might naturally or reasonably be expected to become the objects of his bounty from which he must be able to make a rational selection of his beneficiaries. He must understand the scope and general effect of the provisions of his will in relation to his legatees and devisees. Finally, the testator must be able to contemplate these elements together for a sufficient length of time, without prompting, to form a rational judgment in relation to them; the result of which is expressed in the will.

*O'Brien v. Lumphrey (Estate of O'Loughlin)*, 50 Wis. 2d 143, 146–47, 183 N.W.2d 133 (1971).

¶ 41. The opponent of a will must prove a lack of testamentary capacity by clear, convincing, and satisfactory evidence. *Estate of Sorensen*, 87 Wis. 2d at 344.

We affirm the trial court's finding on testamentary capacity unless it is contrary to the great weight and clear preponderance of the evidence, *id.* at 343, that is, unless it is clearly erroneous, *Schorer v. Schorer*, 177 Wis. 2d 387, 396, 501 N.W.2d 916 (Ct. App. 1993) (equating "contrary to the great weight and clear preponderance of the evidence" standard with the "clearly erroneous" standard). However, we review de novo whether the court applied the correct legal standard to the evidence. *Carney v. Mantuano*, 204 Wis. 2d 527, 532, 554 N.W.2d 854 (Ct. App. 1996).

¶ 42. The court's reading of *Estate of Sorensen* is at the heart of the dispute on the cross-appeal. In *Estate of Sorensen*, the objector to the will contended that the trial court erred in determining the testator possessed testamentary capacity, because, the objector argued, the testator had been adjudicated mentally incompetent approximately four years before executing the will and that legal status had not changed. In rejecting this argument, the court stated:

> The fact that the testator was mentally committed in 1959 is not controlling. The question of a testator's competency is determined at the time of the execution. This court has also recognized that one adjudicated mentally incompetent or subject to guardianship may have lucid intervals during which the individual possesses sufficient testamentary capacity.
>
> The appellant's contention that Sorensen lacked mental capacity is rebutted by the fact that the October 8, 1963 will reflects that the testator was able to convey his wishes and the extent of his estate to the drafting attorney, identify beneficiaries expected to be the objects of his bounty and explain the reasons for the nominal bequests given to two of the named legatees and the exclusion of certain relatives. The testator's ability to perform the foregoing demonstrates testa-

mentary capacity as outlined in the general criteria set forth in *Estate of O'L[o]ughlin* . . . .

The fact of legal guardianship and evidence of an inability to handle one's business affairs is a relevant factor in reaching a decision on testamentary capacity, but it is not solely controlling. We hold that the appellant did not carry the burden of proving Martin V. Sorensen lacked testamentary capacity on October 8, 1963 when his last will and testament was executed.

*Estate of Sorensen*, 87 Wis. 2d at 345–46 (citations omitted).

¶ 43. The trial court here apparently relied on V WISCONSIN JUDICIAL BENCHBOOKS: PROBATE, GUARDIANSHIP, AND MENTAL HEALTH, PR 2–13 (2d ed. 2000)[17] in its

---

[17] V WISCONSIN JUDICIAL BENCHBOOKS: PROBATE, GUARDIANSHIP, AND MENTAL HEALTH, PR 2–13 (2d ed. 2000), provides in part:

**G. Testamentary capacity, generally**

1) Any person may make or revoke will if

 a. 18 years or older

 b. Of sound mind

*Will of Wright*
*266 W 89 (1954)*
*Estate of Staab*
166 W 587 (1918)

2) Mental capacity presumed as fact of normal mind until contrary is shown

 a. If mental illness or lack of testamentary capacity before execution of will can be shown, legal rebuttable presumption has been established that condition continued

*Estate of Sorensen*
87 W2d 587 (1979)

• May be rebutted by establishing a lucid interval

*Will of Zych*
251 W 108 (1947)

b. Presumed that testator knew contents of will

interpretation of the above language from *Estate of Sorensen*. The court read the case to say that, if the objector shows that "the testator had a mental illness or some other lack of testamentary capacity prior to the execution, a presumption is established that the lack of capacity was ongoing (and therefore infected the making of the will)"; and this presumption could be rebutted if the will's proponent shows that the testator had a lucid interval. We can see that the *Estate of Sorensen* court's use of the word "rebutted" might lead to this reading. However, we conclude the *Estate of Sorensen* court did not mean to hold that evidence of prior mental incapacity created a rebuttable presumption as a matter of law. Rather, after rejecting the proposition that, as a matter of law, proof of the prior mental commitment satisfied the standard for lack of testamentary capacity at the time of execution of the will, the *Estate of Sorensen* court simply evaluated the evidence in that particular case: the court acknowledged that the evidence of prior mental commitment was relevant to testamentary capacity at the time of will execution, but decided that, given the evidence of the testator's ability to communicate and understand at the time of will execution, the objector had not met his burden of proving lack of testamentary capacity by clear, convincing, and satisfactory evidence.[18]

---

[18] Gittel agrees *Sorensen v. Ziemke (Estate of Sorensen)*, 87 Wis. 2d 339, 274 N.W.2d 694 (1979), does not support the trial court's statement of the law. However, she asserts that *Ripley v. Babcock*, 13 Wis. 425, 429 (1861), and *Wright v. Jackson*, 59 Wis. 569, 576, 18 N.W. 486 (1884), do. *Ripley* concerns the execution of a mortgage, but the court relied on the proposition from 1 ROBERTS' LAW OF WILLS and STOCK ON LAW OF NON COMPOTES

¶ 44. However, although the trial court was mistaken in its reading of *Estate of Sorensen* and expressed an incorrect legal standard as a result, the actual analysis the court applied was nevertheless correct. The court's analysis shows that it understood that the evidence of Persha's infirm mental state prior to January 26 was not conclusive; the court understood that Gittel had to prove by clear, convincing, and satisfactory evidence that Persha lacked testamentary capacity at the time he signed the will. In this case, because the court found that Persha was consistently disoriented and confused from the time he was admitted to the hospital and because the court credited the evidence that this was the result of Persha's serious illness, the court could reasonably infer that this general condition continued—not as a matter of law but as a matter of fact—at the time Persha signed the will. Thus, it was not error for the court to look for evidence of a lucid interval. Although the court erred in stating that Abram had the burden of proving a lucid interval (because the burden of proving lack of testamentary capacity, and, thus, lack of a lucid interval, remained with Gittel), we conclude the court's analysis of the evidence of a lucid interval was not affected by that error.

MENTIS, 51 (23 Am. Law Library), as support for its statement: "[L]unacy being once established, the burden is on the party claiming through any act of the lunatic, to show it was done in a lucid interval." *Ripley*, 13 Wis. at 429. *Wright*, which concerns a deed, relied on *Ripley* for this proposition. *Wright*, 59 Wis. at 576. We decline to reach back to these cases to establish a presumption and consequent burden-shifting that is inconsistent with the much more recent and clearly established standards for proving lack of testamentary capacity to make a will.

¶ 45. As a practical matter, Abram presented witnesses who testified in support of a lucid interval. The court explained in great detail why it rejected the testimony of each of these witnesses. These reasons did not have to do with which party had the burden of proving a lucid interval. Rather, the reasons were specific to the testimony of each witness—lack of foundation, lack of knowledge, lack of credibility, and vague recollections. This type of evaluation of the evidence is properly the role of the trial court, not a reviewing court. *Becker v. Zoschke (Estate of Becker)*, 76 Wis. 2d 336, 346, 251 N.W.2d 431 (1977). Had the court found some of the testimony of a lucid interval worthy of belief, its allocation to Abram of the burden to prove a lucid interval might have affected the outcome: the court might then have had to weigh evidence for and against a lucid interval, and which party had the burden to prove a lucid interval might have determined whether the court found a lucid interval. But the trial court's finding here that there was no lucid interval was determined by the court's rejection of testimony supporting a lucid interval because of what it viewed as deficiencies in that testimony, and by the court's acceptance of the testimony, which it found credible, that showed there was no lucid interval.

¶ 46. In summary, we agree that the court erroneously stated that the burden shifted to Abram to rebut, through proof of a lucid interval, the presumption that Persha's mental incapacity continued at the time of the execution of the will. However, we conclude this misunderstanding of the law did not affect the court's analysis of the evidence and did not result in a deviation from the correct burden and standard of proof, which the court applied in this case: the objec-

tor must prove lack of testamentary capacity by clear, convincing, and satisfactory evidence. Accepting the court's credibility evaluations as we are bound to do, we conclude the court's determination that Gittel proved lack of testamentary capacity by clear, convincing, and satisfactory evidence is. not clearly erroneous.

## APPEAL—ABRAM'S GOOD FAITH

¶ 47. Returning to Gittel's appeal, we conclude her contention that, even if the trial court had the authority to rescind its finding of undue influence, it erred in ordering that Abram's costs and attorney fees be reimbursed by the estate. Gittel asserts that the absence of undue influence is not the equivalent of good faith under Wis. Stat. §§ 879.35 and 879.37. She points out, correctly, that the court did not explain why it was deciding that Abram propounded the will in good faith, other than to explain its reason for rescinding the finding on undue influence and to conclude in general terms that it would be a manifest injustice if Abram had to pay her costs and attorney fees. Gittel argues that the trial court's findings on Abram's credibility and other findings in the context of its decision on testamentary capacity preclude a finding of good faith.

¶ 48. A court's decision whether to allow costs and attorney fees under Wis. Stat. §§ 879.35 and 879.37 to a personal representative who unsuccessfully propounds the will has two components. First, the court must decide if the proponent propounded the will in good faith. This decision involves making factual findings. *See Lehman v. Henkey (Estate of Alburn)*, 23 Wis. 2d 386, 389–90, 127 N.W.2d 56 (1964) (reviewing trial

court's "finding" of good faith); *see also Schoen v. Van Hogen (Estate of Miller)*, 265 Wis. 420, 425, 61 N.W.2d 813 (1953). If the court finds good faith, then the court may, but need not, award attorney fees. This decision calls for an exercise of the court's discretion. *See Ritt v. Rasmussen (Will of Rasmussen)*, 1 Wis. 2d 615, 621, 85 N.W.2d 383 (1957). We affirm a trial court's factual findings if they are not clearly erroneous, WIS. STAT. § 805.17(2); we affirm a discretionary decision if the court applied the correct law to the relevant facts and reasoned its way to a reasonable conclusion. *Burkes v. Hales*, 165 Wis. 2d 585, 590, 478 N.W.2d 37 (Ct. App. 1991).

¶ 49. When a court does not expressly make a finding that is necessary to its decision, we may assume it made that finding, *State v. Long*, 190 Wis. 2d 386, 398, 526 N.W.2d 826 (Ct. App. 1994), and we review the record to determine if the presumed finding is clearly erroneous. Similarly, when a court does not adequately explain a discretionary decision, we may review the record to determine whether the record supports the trial court's decision. *State v. Clark*, 179 Wis. 2d 484, 490, 507 N.W.2d 172 (Ct. App. 1993).

¶ 50. We agree with Gittel that the evidence the court relied on to find no undue influence by Abram— her close and long-term relationship with Persha, that she was the natural object of his bounty, and that he would have left most, if not all, of his estate to her had he possessed testamentary capacity—does not in this case completely address the question of her good faith. The court had made findings in the context of its decision on testamentary capacity—which it did not rescind—that suggest the court believed that Abram knew Persha lacked testamentary capacity and nevertheless ar-

ranged for him to sign the will and propounded the will.[19] This is not a case, therefore, where there is simply *evidence* that would support a finding that Abram did not act in good faith: in such a situation we would affirm as long as there was evidence to support the finding of good faith that the trial court made. *See Estate of Becker*, 76 Wis. 2d at 347. Rather, in this case, there are arguably other *findings* made by the trial court, based on the evidence, that appear contrary to a finding of good faith.

¶ 51. However, we do not agree with Gittel that it is appropriate to reverse the trial court's implicit finding on good faith. The apparently contrary findings were not brought to the court's attention, and therefore the court never had the opportunity to consider previous findings that might conflict with a finding of good faith.[20]

---

[19] For example, in the context of rejecting Abram's account of her conversation with Persha after he executed the will, the court stated:

> The fact that she did not take steps to show to the witnesses at the time of the execution of the Will that Mr. Persha understood the document and was in agreement with it, strongly indicates to the Court that Ms. Abram was aware that if appropriate questions had been asked of Mr. Persha in the presence of the witnesses, that he would not have understood and that he would not have been able to express what the document that he was signing was doing.

[20] We do not fault Gittel for not bringing these findings to the trial court's attention at the hearing. The court did not ask Gittel to address whether, assuming it rescinded the finding on undue influence, there was still a basis for finding Abram had not acted in good faith. And we cannot say that Gittel should have anticipated that, once the court announced its decision to rescind the finding on undue influence, it would immediately and without further explanation decide that the estate should reimburse Abram's costs and attorney fees.

¶ 52. We conclude the correct course is to reverse the trial court's order that the estate reimburse Abram's costs and attorney fees and remand to permit the court to determine whether Abram acted in good faith in propounding the will. The court need take no additional evidence, and need conduct only such further proceedings as it considers necessary to resolve this issue.

*By the Court.*—Judgment affirmed; order affirmed in part, reversed in part and cause remanded.