SEIDL, J.
¶1 Emil L. Wiesman ("Bud") appeals a judgment, entered following a bench trial, voiding amendments made by his parents, Emil O. and Irma Wiesman,[1] to their individual revocable living trusts. Bud argues the circuit court erred in finding that his parents lacked testamentary capacity when they amended their trusts in 2014. We disagree and affirm.
BACKGROUND
¶2 On May 11, 1990, both Emil and Irma executed individual revocable trusts. The trusts provided that, upon their deaths, their daughter, Debra Wiesman, would receive all of their securities, except for certain securities that were to go to Bud's children. Although the trusts did not provide for Bud to receive any securities, he was excused from making further payments on an installment sales contract for his purchase of the family mink farm. Both parents amended their respective trusts several times.[2]
¶3 Following the execution of amendments in 2012, the terms of the parents' trusts were as follows. Emil's trust provided that upon his death Debra was to receive the entirety of Emil's Morgan Stanley/Smith Barney and CoVantage Credit Union accounts, with the remainder of Emil's assets being divided equally between Bud and Debra. Irma's trust provided that upon her death Debra was to receive the entirety of Irma's Morgan Stanley/Smith Barney account, and Bud was to receive the entirety of her CoVantage Credit Union accounts. The remainder of Irma's assets were to be divided equally between Bud and Debra. As a result of these provisions, Debra was to receive a greater share of the parents' combined assets than Bud.
¶4 In January 2013, after Bud and Debra learned that their parents were abusing prescription medication, Debra sought and received physicians' declaration of incapacity for both parents. The declarations of incapacity allowed Debra to activate the parents' existing powers of attorney for health care, which appointed Debra as parents' health care agent. As her parents' health care agent, Debra was able to curtail the prescription drug abuse by arranging in-home supervision from health care providers for the parents, who at that time were still living independently.
¶5 The parents continued to live on their own for another year, until Debra and Bud agreed to move them to Birch Hill Care Center, a long-term care facility in Shawano. On February 12, 2014, Dr. Andrew Pahl, a geriatrics specialist, examined the parents as part of the admissions process at Birch Hill. Pahl diagnosed both with dementia, which he defined at trial as "a very broad category with many different causes ... but mostly memory impairment and then inability to carry out the functions to stay independent."
¶6 Bud and his wife, Karen, lived in closer proximity to Birch Hill than did Debra. Accordingly, Bud and Karen began to take an increasingly active role in the parents' care, including providing assistance to Debra in the payment of the parents' bills. To facilitate this assistance, Bud contacted Attorney James Aschenbrener in July 2014 to try to gain access to his parents' financial accounts. Aschenbrener drafted a durable power of attorney that appointed both Bud and Debra as agents for their parents. On July 16, 2014, the parents signed the powers of attorney in Aschenbrener's presence.
¶7 Immediately after the durable powers of attorney were executed, Bud used them and discovered that the parents' accounts were held in trust. Bud informed Aschenbrener of this discovery, and Aschenbrener-who mistakenly assumed that the parents shared a joint trust-prepared an amendment to a joint trust appointing Bud and Debra as co-trustees. Despite the fact that they did not share a joint trust, both parents signed this amendment, in Aschenbrener's presence, on July 17, 2014.
¶8 On August 24, 2014, Bud, Karen, and their daughter searched the parents' home for financial documents and discovered the original trust paperwork. Upon review of the documents, Bud learned the parents had individual trusts that provided for an unequal distribution of their assets between himself and Debra. The next day, Bud and Karen visited the parents at Birch Hill and asked them about this uneven distribution of assets. After a discussion, the parents ultimately agreed that their assets should be divided equally, and they asked to have the trust documents amended. Aschenbrener therefore drafted amendments for each of the parents' individual trusts, with the amendments providing for an equal distribution of assets to Bud and Debra.
¶9 On August 26, 2014, the parents signed these amendments (the 2014 amendments) in Aschenbrener's presence. The next day, Bud signed an acceptance of appointment as co-trustee for both of his parents. Debra never signed the acceptance of her appointment as co-trustee.
¶10 After Emil passed away in January 2015, Bud filed a petition seeking, in relevant part, an ex parte temporary restraining order (TRO), a temporary injunction against Debra acting under the pre-2014 trusts, a declaratory judgment, the removal of Debra as co-trustee, and enforcement of the 2014 amendments. The circuit court granted that TRO. Debra subsequently filed her own motion seeking, in relevant part, a TRO preventing Bud from acting under the 2014 amendments and the removal of Bud as co-trustee. The court signed Debra's proposed TRO, thereby effectively vacating its previous TRO, and removed Bud as co-trustee and appointed Debra as sole trustee.
¶11 Debra then moved for summary judgment and a declaration that the 2014 amendments were null and void. The circuit court denied summary judgment and set the matter for a bifurcated trial, with the initial issue being whether the parents had testamentary capacity at the time the 2014 amendments were executed.
¶12 The circuit court held a two-day bench trial, after which the parties were allowed to submit written final arguments and briefs. The court subsequently rendered an oral decision, finding that the parents did not have testamentary capacity at the time they executed the 2014 amendments. The court therefore entered a judgment voiding the 2014 amendments. Bud now appeals.
DISCUSSION
¶13 Bud contends the circuit court erred by finding that the parents did not have testamentary capacity when they signed the 2014 amendments. On review, we will affirm a circuit court's finding regarding testamentary capacity unless that finding is contrary to the great weight and clear preponderance of the evidence. Becker v. Zoschke , 76 Wis. 2d 336, 345, 251 N.W.2d 431 (1977). In other words, we will affirm the court's finding unless it is clearly erroneous. Gittel v. Abram , 2002 WI App 113, ¶ 41, 255 Wis. 2d 767, 649 N.W.2d 661. However, we independently review whether the court applied the correct legal standards in making its finding. Id.
¶14 The legal standard for testamentary capacity is well-established:
The testamentary capacity necessary to execute a valid will requires that the testator have the mental capacity to comprehend the nature, extent and state of affairs of his [or her] property, an understanding of his [or her] relationship to persons who are or might naturally be expected to be the objects of his [or her] bounty and that the testator understand the scope and general effect of the provisions of his [or her] will in relation to his [or her] legatees and devisees.
Sorensen v. Ziemke , 87 Wis. 2d 339, 344, 274 N.W.2d 694 (1979).[3] The testator need only have testamentary capacity at the time a testamentary document is executed; it is not necessary that the testator remain competent for any great length of time either before or after the execution. O'Brien v. Lumphrey , 50 Wis. 2d 143, 147, 183 N.W.2d 133 (1971). Further, a testator is presumed to have testamentary capacity. Mueller v. Gaudynski , 46 Wis. 2d 393, 398, 175 N.W.2d 272 (1970). Therefore, the party opposing a testamentary document bears the burden to prove a lack of testamentary capacity at the time a testamentary document is executed by clear, convincing, and satisfactory evidence. Gittel , 255 Wis. 2d 767, ¶ 41.
¶15 Here, the record establishes the circuit court applied the correct legal standards and its finding that the parents lacked testamentary capacity when they executed the 2014 amendments was not clearly erroneous. In its oral decision, the court identified the reasons it determined the parents lacked testamentary capacity at the time they signed the amendments.
¶16 First, the circuit court found the parents did not have a "full understanding of their assets." This finding was supported by Karen's testimony that the day before the 2014 amendments were signed, the parents were unaware that the value of their Morgan Stanley stock was nearly $1.8 million. Further, Dr. Pahl testified that, to a reasonable degree of medical certainty, Emil and Irma did not have the mental capacity to comprehend the nature and extent of their estate when they signed the 2014 amendments. This testimony was based on his personal evaluations of the parents, as well as his review of their complete Birch Hill medical records, which we discuss in detail below.
¶17 Second, the circuit court found the parents did not understand or recall information concerning the scope and effect of their estate plan. Again, the evidence supported this finding. Aschenbrener testified that in July 2014, the parents "didn't know" whether they had financial powers of attorney in place. That same month, the parents signed an amendment to a joint trust, despite the fact that they each had separate individual trusts in place for over twenty years and had no joint trusts. Furthermore, when the parents told Bud that they would amend the terms of their individual trusts on August 25, 2014, they did not know an attorney they could use to do so. This occurred despite the fact that, just a month previously, Aschenbrener had prepared an amendment for them to sign.
¶18 Finally, the circuit court found that the parents' dementia affected their ability to "make a proper amendment." This finding is again supported by Dr. Pahl's testimony and the Birch Hill medical records. Pahl testified that in February 2014, he diagnosed the parents with dementia after using a "mini-mental" series of questions and observing their behavior. Pahl further testified that the parents' mental states did not improve after their admission to Birch Hill.
¶19 Pahl's testimony was corroborated by the parents' Birch Hill medical records, which were entered into evidence and cited by the court in its oral decision. The parents' medical records showed that both parents' dementia was progressive and that they displayed mental impairment throughout the month of August 2014. For instance, notes from an August 19 assessment of Emil state he had poor decision-making skills, intermittent confusion, and cognitive deficits. On August 26, the day the 2014 amendments were signed, notes stated that for the "past week [Emil had] exhibited behavior of yelling and screaming. This is normal behavior for resident due to dementia."
¶20 Irma's medical records reflected similar behavior in August 2014. For example, on August 5, Irma could not report the correct day of the week, nor could she recall three words that she had been asked to remember a few minutes prior. Notes from August 18 stated Irma had impaired decision making, short-term memory impairment, long-term memory impairment, and confusion. And on August 20, staff reported Irma was not oriented to the time or situation, could not recall staff names or faces, and had short-term memory impairment and confusion.
¶21 Bud argues the circuit court erred because the only evidence regarding the parents' testamentary capacity at the time they signed the 2014 amendments came from Bud, Karen, and Aschenbrener. They testified that the parents generally appeared lucid and did not show evidence of mental incapacity. Therefore, Bud states the court was compelled to find that the parents did, in fact, have testamentary capacity. In support, Bud relies on the language in Becker that "a person may have a general or usual condition of inability to comprehend and yet have lucid intervals, during which time there is demonstrated testamentary capacity." Becker , 76 Wis. 2d at 345. Further, he argues that because the question of testamentary capacity is "determined as of the time of the execution," evidence that supports a finding of a lucid interval at the time a testamentary document is signed is dispositive. See Sorensen , 87 Wis. 2d at 345.
¶22 Bud's argument fails because it incorrectly limits the facts relevant to an inquiry into testamentary capacity to the moment or day that a document was signed. Although testamentary capacity need only exist at the time a testamentary document is executed, the circuit court, as trier of fact, may consider the totality of the facts and circumstances in the record to determine whether a lucid interval did, in fact, occur at that time. See Gittel , 255 Wis. 2d 767, ¶ 44. In other words, evidence regarding testamentary capacity at the time a testamentary document is signed is relevant to, but not dispositive of, the issue of testamentary capacity. Furthermore, evidence concerning a testator's general mental state is also not dispositive of testamentary capacity, but such evidence may provide the basis for an inference that testamentary capacity did or did not exist at the time a testamentary document was signed.
¶23 For example, in Gittel , the circuit court heard evidence that a testator had experienced periods of "deliriousness" and "confusion and disorientation" in the days prior to executing a will. Id. , ¶¶ 31-32. The court also heard evidence that supported the inference that the testator experienced a lucid interval at the time the will was executed. Id. , ¶ 37. We concluded the court properly exercised its discretion by rejecting the evidence that supported a finding of a lucid interval and instead finding that the testator's "general condition continued-not as a matter of law but as a matter of fact-at the time [the testator] signed the will." Id. , ¶ 44.
¶24 Similarly, here, the circuit court rejected evidence that could have supported a finding that the parents experienced a lucid interval at the time they signed the 2014 amendments. Rather, the court found, as a matter of fact, that the parents' general condition of dementia continued and they lacked testamentary capacity at the signing. We conclude this finding was not clearly erroneous.
¶25 In this regard, we note the circuit court's finding was based primarily on the testimony of Dr. Pahl, which it found credible and therefore assigned "a lot of weight." The court cited Pahl's medical credentials, lack of bias, and the consistency of his testimony with the parents' medical records as reasons for crediting his testimony. The court also noted that although the dementia diagnoses were not conclusive proof that the parents lacked testamentary capacity, it was "certainly evidence of some problems."
¶26 Conversely, the circuit court assigned little weight to the testimony of Bud, Karen, and Aschenbrener. Regarding Aschenbrener, the court found that there was "some inconsistency" with his testimony. Specifically, the court found that Aschenbrener testified that he interviewed the parents alone on the day they signed the 2014 amendments, but Bud testified that he was also present during the interview. Furthermore, the court assigned less weight to Aschenbrener's testimony because Aschenbrener did not know that, at the time the parents signed the 2014 amendments, they had been diagnosed with dementia. The court reasoned that if Aschenbrener had known of the parents' dementia diagnoses, he could have made "determinations of proof" as to their testamentary capacity and "taken some other precautions."
¶27 The circuit court also discredited Karen's trial testimony because it was inconsistent with testimony she gave at her deposition. Specifically, the court found that, at trial, Karen testified that she did not know the parents had been diagnosed with dementia when they signed the 2014 amendments, but in her deposition she testified that she did know of their diagnoses but chose not to tell Aschenbrener. The court also considered both Bud and Karen biased, and it found the fact that only two days had passed between the discovery of the trust documents and the signing of the 2014 amendments "very suspicious." Furthermore, the court considered the unequal distribution of the estate-prior to the 2014 amendments-a reflection of the fact that the parents had forgiven Bud's payments to them on the family mink farm purchase, and it concerned the court that the parents would switch to an equal division of their estate after over twenty years of this unequal distribution.
¶28 Still, Bud insists the circuit court erred because it assigned undue weight to Dr. Pahl's medical opinion and impermissibly considered the timing and terms of the 2014 amendments. We are not persuaded. The weighing of evidence is "the role of the trial court, not a reviewing court." Gittel , 255 Wis. 2d 767, ¶ 45. Further, "the credibility of witnesses and the weight to be given to their testimony are matters for the trial court, as are the inferences to be drawn from the evidence." Dobrecevich v. Brandt , 14 Wis. 2d 82, 85, 109 N.W.2d 477 (1961). Given the court's detailed explanation of its rationale and the evidentiary support for that rationale in the record, we accept the court's determinations, as we must, because they were not clearly erroneous.
¶29 Bud also argues the circuit court erred by shifting the burden of proof from Debra-to prove a lack of testamentary capacity-onto Bud, by making him prove the parents' lucid intervals. In support of that argument, Bud points to the following statement in the court's oral decision: "I am aware of the I want to say the Sorensen case; if that was the one, where the Sorensen case said after you have a notice of these types of medical conditions then it switches the burden and that's not the case."
¶30 We are not persuaded the circuit court improperly shifted the burden, because the court's statement was nothing more than a summation of what we said in Gittel :
The [trial] court read the [Sorensen ] case to say that, if the objector shows that "the testator had a mental illness or some other lack of testamentary capacity prior to the execution, a presumption is established that the lack of capacity was ongoing (and therefore infected the making of the will)"; and this presumption could be rebutted if the will's proponent shows that the testator had a lucid interval. We can see that the [Sorensen ] court's use of the word "rebutted" might lead to this reading. However, we conclude the [Sorensen ] court did not mean to hold that evidence of prior mental incapacity created a rebuttable presumption as a matter of law.
Gittel , 255 Wis. 2d 767, ¶ 43. Further, the court articulated the proper burden of proof in its oral decision when it stated that "[Debra] has ... burden of proof to show that [the parents] lack testamentary capacity."[4]
¶31 In sum, we conclude the circuit court properly recognized that evidence of dementia existing prior to the day on which an objected-to testamentary document is signed is not conclusive proof of a lack of testamentary capacity, but that such a diagnosis may be relevant evidence that supports such a finding under the totality of the circumstances. And, although a determination of testamentary capacity is made at the time of signing, evidence from witnesses at times other than the exact moment of signing may also be relevant and should be considered by the factfinder. To hold otherwise would vitiate the need for a court to apply the test set forth in Sorensen and make it essentially impossible to contest or overturn any testamentary document for a lack of testamentary capacity.
By the Court. -Judgment affirmed.
Not recommended for publication in the official reports.

We will refer to Emil O. and Irma Wiesman collectively as "the parents" and individually by their first names.

In addition to the amendments that are at issue here, the record contains amendments to each trust made in 2002, 2011, and 2012. The 2002 and 2011 amendments also reference 1998 amendments to each trust, but the 1998 amendments do not appear in the appellate record. Regardless, those amendments are not at issue in this appeal and we will not further address them.

The testamentary capacity necessary to amend a revocable trust is "the same as that required to make a will." Wis. Stat. § 701.0601 (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The record reflects the circuit court actually referred to "Karen Wiesman." However, it is clear from the context of the court's decision that it merely misspoke by naming Karen, who was not a party in the case, instead of Debra.